# BALTIMORE AND OHIO RAILROAD COMPANY *v.* BAUGH.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF OHIO.

No. 89. Argued December 9, 12, 1893. — Decided May 1, 1893.

Whether the engineer and fireman of a locomotive engine, running alone on a railroad and without any train attached, are fellow-servants of the company, so as to preclude the latter from recovering from the company for injuries caused by the negligence of the former, is not a question of local law, to be settled by the decisions of the highest court of the State

in which a cause of action arises, but is one of general law, to be deter-
mined by a reference to all the authorities, and a consideration of the
principles underlying the relations of master and servant.

Such engineer and such fireman, when engaged on such duty are, when so
considered, fellow-servants of the railroad company, and the fireman is
precluded by principles of general law from recovering damages from
the company for injuries caused, during the running, by the negligence
of the engineer.

*Chicago, Milwaukee & St. Paul Railway* v. *Ross*, 112 U. S. 377, explained
and distinguished.

JOHN BAUGH, defendant in error, was employed as a fireman
on a locomotive of the plaintiff in error, and while so employed
was injured, as is claimed, through the negligence of the
engineer in charge thereof. He commenced a suit to recover
for these injuries in the Circuit Court of the United States for
the Southern District of Ohio.

The circumstances of the injury were these : The locomotive
was manned by one Hite, as engineer, and Baugh, as fireman,
and was what is called in the testimony a "helper." On May
4, 1885, it left Bellaire, Ohio, attached to a freight train, which
it helped to the top of the grade about twenty miles west of
that point. At the top of the grade the helper was detached,
and then returned alone to Bellaire. There were two ways
in which it could return, in conformity to the rules of the
company : one, on the special orders of the train dispatcher at
Newark, and the other, by following some regular scheduled
train, carrying signals to notify trains coming in the opposite
direction that the helper was following it. This method was
called in the testimony "flagging back." On the day in
question, without special orders, and not following any sched-
uled train, the helper started back for Bellaire, and on the
way collided with a regular local train, and in the collision
Baugh was injured. Baugh had been in the employ of the
railroad company about a year, had been fireman about six
months, and had run on the helper, two trips a day, about
two months. He knew that the helper had to keep out of the
way of the trains, and was familiar with the method of flag-
ging back.

No testimony was offered by the defendant, and at the close

of the plaintiff's testimony the defendant asked the court to direct a nonsuit, which motion was overruled, to which ruling an exception was duly taken. In its charge to the jury the court gave this instruction: "If the injury results from negligence or carelessness on the part of one so placed in authority over the employé of the company, who is injured, as to direct and control that employé, then the company is liable." To which instruction an exception was duly taken. The jury returned a verdict for the plaintiff for $6750, and upon this verdict judgment was entered. To reverse which, the railroad company sued out a writ of error from this court.

*Mr. John K. Cowen*, (with whom was *Mr. Hugh L. Bond, Jr.*, on the brief,) for plaintiff in error.

*Mr. L. Danford*, (with whom was *Mr. James C. Tallman* on the brief,) for defendant in error.

MR. JUSTICE BREWER delivered the opinion of the court.

The single question presented for our determination is, whether the engineer and fireman of this locomotive, running alone and without any train attached, were fellow-servants of the company, so as to preclude the latter from recovering from the company for injuries caused by the negligence of the former.

This is not a question of local law, to be settled by an examination merely of the decisions of the Supreme Court of Ohio, the State in which the cause of action arose, and in which the suit was brought, but rather one of general law, to be determined by a reference to all the authorities, and a consideration of the principles underlying the relations of master and servant.

The question as to what is a matter of local, and what of general law, and the extent to which in the latter this court should follow the decisions of the state courts, has been often presented. The unvarying rule is, that in matters of the latter class this court, while leaning towards an agreement with the

views of the state courts, always exercises an independent judgment; and as unvarying has been the course of decision, that the question of the responsibility of a railroad corporation for injuries caused to or by its servants is one of general law. In the case of *Swift* v. *Tyson*, 16 Pet. 1, the first proposition was considered at length. On p. 18 it is thus stated: "But, admitting the doctrine to be fully settled in New York, it remains to be considered whether it is obligatory upon this court if it differs from the principles established in the general commercial law. It is observable that the courts of New York do not found their decisions upon this point upon any local statute, or positive, fixed, or ancient local usage, but they deduce the doctrine from the general principles of commercial law. It is, however, contended that the thirty-fourth section of the Judiciary Act of 1789, c. 20, furnishes a rule obligatory upon this court to follow the decisions of the state tribunals in all cases to which they apply. That section provides 'that the laws of the several States, except where the Constitution, treaties, or statutes of the United States shall otherwise require or provide, shall be regarded as rules of decision, in trials at common law, in the courts of the United States, in cases where they apply.' In order to maintain the argument, it is essential, therefore, to hold that the word 'laws,' in this section, includes within the scope of its meaning the decisions of the local tribunals. In the ordinary use of language it will hardly be contended that the decisions of courts constitute laws. They are, at most, only evidence of what the laws are, and are not, of themselves, laws. They are often reëxamined, reversed, and qualified by the courts themselves, whenever they are found to be either defective, or ill-founded, or otherwise incorrect. The laws of a State are more usually understood to mean the rules and enactments promulgated by the legislative authority thereof, or long-established local customs having the force of laws. In all the various cases which have hitherto come before us for decision, this court has uniformly supposed that the true interpretation of the thirty-fourth section limited its application to state laws strictly local, that is to say, to the positive statutes of the

State, and the construction thereof adopted by the local tribunals, and to rights and titles to things having a permanent locality, such as the rights and titles to real estate, and other matters immovable and intraterritorial in their nature and character."

Notwithstanding the interpretation placed by this decision upon the thirty-fourth section of the Judiciary Act of 1789, Congress has never amended that section; so it must be taken as clear that the construction thus placed is the true construction, and acceptable to the legislative as well as to the judicial branch of the government. This decision was in 1842. Forty years thereafter, in *Burgess* v. *Seligman,* 107 U. S. 20, the matter was again fully considered, and it was said by Mr. Justice Bradley, on pp. 33 and 34, that "the Federal courts have an independent jurisdiction in the administration of state laws, coördinate with and not subordinate to, that of the state courts, and are bound to exercise their own judgment as to the meaning and effect of those laws. The existence of two coördinate jurisdictions in the same territory is peculiar, and the results would be anomalous and inconvenient but for the exercise of mutual respect and deference. Since the ordinary administration of the law is carried on by the state courts, it necessarily happens that by the course of their decisions certain rules are established which become rules of property and action in the State, and have all the effect of law, and which it would be wrong to disturb. This is especially true with regard to the law of real estate and the construction of state constitutions and statutes. Such established rules are always regarded by the Federal courts, no less than by the state courts themselves, as authoritative declarations of what the law is. But where the law has not been thus settled, it is the right and duty of the Federal courts to exercise their own judgment; as they always do in reference to the doctrines of commercial law and general jurisprudence. . . . As, however, the very object of giving to the national courts jurisdiction to administer the laws of the States in controversies between citizens of different States was to institute independent tribunals which it might be supposed would be unaffected by local

prejudices and sectional views, it would be a dereliction of their duty not to exercise an independent judgment in cases not foreclosed by previous adjudication. As this matter has received our special consideration, we have endeavored thus briefly to state our views with distinctness in order to obviate any misapprehensions that may arise from language and expressions used in previous decisions. The principal cases bearing upon the subject are referred to in the note, but it is not deemed necessary to discuss them in detail." And in the note referred to over fifty cases are cited, in which the proposition had been in terms stated or in fact recognized. Since the case of *Burgess* v. *Seligman* the same proposition has been again and again affirmed.

Whatever differences of opinion may have been expressed, have not been on the question whether a matter of general law should be settled by the independent judgment of this court, rather than through an adherence to the decisions of the state courts, but upon the other question, whether a given matter is one of local or of general law. Thus in the case of *Bucher* v. *Cheshire Railroad Co.*, 125 U. S. 555, these facts appeared: A statute of Massachusetts forbade travel on the Lord's day, except for necessity or charity, under penalty of a fine not exceeding ten dollars. The plaintiff, while riding in the cars of the defendant in violation of that statute, was injured through its negligence. The defendant pleaded his violation of this statute as a bar to any recovery, citing repeated decisions of the highest court of that State sustaining such a defence. This court followed those decisions. It is true, as said in the opinion, that there was no dispute about the meaning of the language used by the legislature, so this court was not following the construction placed upon the statute by the Massachusetts court, but only those decisions as to its effect. And yet, from that opinion two of the Justices dissented, holding that, notwithstanding it was a dispute as to the effect of a state statute, it was still a question of general law.

Again, in the case of *Detroit* v. *Osborne*, 135 U. S. 492, 499, the plaintiff was injured while walking in one of the streets of

Detroit, through a defect in the sidewalk. The Supreme Court of Michigan had held that the duty resting upon the city, of keeping its streets in repair, was a duty to the public, and not to private individuals, the mere neglect of which was a non-feasance only, for which no private action for damages arose. This court followed that ruling, although conceding that it was not in harmony with the general opinion, nor in accordance with views of its own, and this was done on the ground that the question was one of a purely local nature. This quotation was made from the opinion in *Claiborne County* v. *Brooks*, 111 U. S. 400, 410, as fully expressing the reasons for so following the rulings of the Michigan court: "It is undoubtedly a question of local policy with each State what shall be the extent and character of the powers which its various political and municipal organizations shall possess, and the settled decisions of its highest courts on this subject will be regarded as authoritative by the courts of the United States; for it is a question that relates to the internal constitution of the body politic of the State." Observations of a similar nature are pertinent to other cases, in which this court has felt itself constrained to yield its own judgment to the decisions of the state courts.

Again, according to the decisions of this court, it is not open to doubt that the responsibility of a railroad company to its employés is a matter of general law. In *Railroad Company* v. *Lockwood*, 17 Wall. 357, 368, the question was as to the extent to which a common carrier could stipulate for exemption from responsibility for the negligence of himself or his servants, and notwithstanding there were decisions of the courts of New York thereon, the State in which the cause of action arose, this court held that it was not bound by them, and that in a case involving a matter of such importance to the whole country it was its duty to proceed in the exercise of an independent judgment. In *Hough* v. *Railway Company*, 100 U. S. 213, 226, was presented the liability of a company to its servant for injuries caused by negligence, and Mr. Justice Harlan thus expressed the views of the entire court: "Our attention has been called to two cases determined in the

Supreme Court of Texas, and which, it is urged, sustain the principles announced in the court below. After a careful consideration of those cases, we are of opinion that they do not necessarily conflict with the conclusions we have reached. Be this as it may, the questions before us, in the absence of statutory regulations by the State in which the cause of action arose, depend upon principles of general law, and in their determination we are not required to follow the decisions of the state courts." In *Myrick* v. *Mich. Cent. Railroad*, 107 U. S. 102, 108, the question was whether a bill of lading, issued by a railroad company, whereby the company agreed to carry cattle beyond its own line to the place named for final delivery, was a through contract. The ticket or bill of lading was issued in Illinois, and the rulings of the Supreme Court of that State, as to the effect of such a ticket or bill of lading, were claimed to be conclusive; but this court declined to follow them, and in the exercise of its own judgment placed a different construction upon the contract. And in the recent case of *Railway Company* v. *Prentice*, 147 U. S. 101, 106, where the question arose as to the right to recover from the railway company punitive damages for the wanton and oppressive conduct of one of its conductors towards a passenger, it was said: "This question, like others affecting the liability of a railroad corporation as a common carrier of goods or passengers, — such as its right to contract for exemption from responsibility for its own negligence, or its liability beyond its own line, or its liability to one of its servants for the act of another person in its employment, — is a question, not of local law, but of general jurisprudence, upon which this court, in the absence of express statute regulating the subject, will exercise its own judgment, uncontrolled by the decisions of the courts of the several States."

Not only that, but in the cases of *Wabash Railway* v. *McDaniels*, 107 U. S. 454, a case arising in the State of Indiana; *Randall* v. *Baltimore & Ohio Railroad*, 109 U. S. 478, arising in West Virginia; and *Chicago, Milwaukee &c. Railway* v. *Ross*, 112 U. S. 377, coming from Minnesota — all three cases being actions by employés to recover damages

against railroad companies for personal injuries — the question of the liability of the company was discussed as one of general law, and no reference made to the decisions of the State in which the injuries took place. And, in the last case, the instruction given by the circuit judge, which was sustained by this court, was in direct opposition to the rulings of the Supreme Court of Minnesota. Thus, in *Brown* v. *Winona & St. Peter Railroad Company*, 27 Minnesota, 162, a case called to the attention of this court, that court held that " a master is not liable to one servant for injuries caused by the negligence of a co-servant in the same common employment," and " that the negligent servant is superior in authority, or an overseer of the one injured, does not take the case out of this rule." And in the opinion, on p. 165, it is said : " It is upon this point that the authorities disagree. Some courts, the Supreme Court of Ohio being the leading one, hold that where the injured servant is subordinate to him whose negligence causes the injury, they are not ' fellow-servants,' and the master is liable. On the other hand, the great majority of courts, both in this country and in England, hold that mere difference in grade of employment, or in authority, with respect to each other, does not remove them from the class of fellow-servants. as regards the liability of the master for injuries to one caused by the negligence of the other." The same doctrine was announced in *Brown* v. *Minneapolis & St. Louis Ry. Co.*, 31 Minnesota, 553, and *Fraker* v. *St. Paul, Minneapolis &c. Railway*, 32 Minnesota, 54, both decided before the *Ross case*, and reaffirmed since in *Gonsior* v. *Minneapolis & St. Louis Railway*, 36 Minnesota, 385. Indeed, in all the various cases in this court, affecting the relations of railroad companies to their employés, it has either been directly affirmed that the question presented was one of general law, or else the discussion has proceeded upon the assumption that such was the fact.

An examination of the opinions in the cases in the Ohio Supreme Court, which are claimed to be authoritative here, discloses that they proceed not upon any statute, or upon any custom or usage, or, upon anything of a local nature, but simply announce the views of that court upon the question

as one of general law. We agree with that court, in holding it to be a question of general law, although we differ from it, as to what the rule is by that law. Indeed, the Ohio court is not wholly satisfied with that doctrine, as appears from the cases of *Whaalan* v. *Mad River &c. Railroad*, 8 Ohio St. 249, and *Pittsburg, Fort Wayne &c. Railway* v. *Devinney*, 17 Ohio St. 197. In the last case it disagrees with the conclusions reached by this court in the case of *Chicago, Milwaukee &c. Railway* v. *Ross, supra*, and holds that a conductor of a train is not always to be regarded as a vice-principal or representative of the company. In that case, a brakeman on one train was injured through the negligence of the conductor of another, and they were held to be fellow-servants, and the latter not a vice-principal or representative of the company, for whose negligence it was responsible. The opinion in that case is significant as showing that the question was regarded as one of common or general law; that the ordinary rule is in accordance with the views we have reached in this case; and that the Ohio doctrine is confessedly an exception. We quote from it as follows (p. 212): "The true general rule is, and so it must be, that when men are employed for the prosecution of a lawful but hazardous business, they assume the hazards of such employment arising from the negligence of coemployés, and stipulate for compensation according to their estimate of such hazards; subject, however, to this exception, that the master is liable for such injuries as accrued to the servant from the negligence of a fellow-servant in the selection of whom the master has been culpably negligent; and to this we in Ohio have added the further exception of a case where the servant injured is subordinate to, and acting under the orders of, the culpable fellow-servant. For the reasoning on which the decisions establishing this exception are based, the members of this court, as now constituted, are not responsible; nor are we at all bound to carry out their logic to its ultimate consequences. In subsequent cases, strictly analogous in their facts, those decisions will doubtless be accepted as authoritative; but the case now before us does not require us to review them. In adding this last-named exception to the rule else-

where generally established, we have already diverged from the general current of judicial decision elsewhere. A majority of the court are unwilling to increase the divergency; doubting, as we do, the wisdom of such a step, and being unwilling to assume the responsibility of what would savor so strongly of judicial legislation."

But passing beyond the matter of authorities, the question is essentially one of general law. It does not depend upon any statute; it does not spring from any local usage or custom; there is in it no rule of property, but it rests upon those considerations of right and justice which have been gathered into the great body of the rules and principles known as the "common law." There is no question as to the power of the States to legislate and change the rules of the common law in this respect as in others; but in the absence of such legislation the question is one determinable only by the general principles of that law. Further than that, it is a question in which the nation as a whole is interested. It enters into the commerce of the country. Commerce between the States is a matter of national regulation, and to establish it as such was one of the principal causes which led to the adoption of our Constitution. To-day, the volume of interstate commerce far exceeds the anticipation of those who framed this Constitution, and the main channels through which this interstate commerce passes are the railroads of the country. Congress has legislated in respect to this commerce not merely by the Interstate Commerce Act and its amendments, 24 Stat. 379, c. 104, but also by an act passed at the last session, requiring the use of automatic couplers on freight cars. Public Acts, 52d Cong. 2d Sess., c. 113. The lines of this very plaintiff in error extend into half a dozen or more States, and its trains are largely employed in interstate commerce. As it passes from State to State, must the rights, obligations and duties subsisting between it and its employés change at every state line? If to a train running from Baltimore to Chicago it should, within the limits of the State of Ohio, attach a car for a distance only within that State, ought the law controlling the relation of a brakeman on that car to the

company to be different from that subsisting between the brakemen on the through cars and the company? Whatever may be accomplished by statute — and of that we have now nothing to say — it is obvious that the relations between the company and employé are not in any sense of the term local in character, but are of a general nature, and to be determined by the general rules of the common law. The question is not local, but general. It is also one of the vexed questions of the law, and perhaps there is no one matter upon which there are more conflicting and irreconcilable decisions in the various courts of the land· than the one as to what is the test of a common service, such as to relieve the master from liability for the injury of one servant through the negligence of another. While a review of all these cases is impossible, it may be not amiss to notice some, and to point out what are significant factors in such a question.

Counsel for defendant in error rely principally upon the case of *Railroad Co.* v. *Ross,* 112 U. S. 377, taken in connection with this portion of rule No. 10 of the company: "Whenever a train or engine is run without a conductor, the engineman thereof will also be regarded as conductor, and will act accordingly." The *Ross case,* as it is commonly known, decided that "a conductor of a railroad train, who has a right to command the movements of a train and control the persons employed upon it, represents the company while performing those duties, and does not bear the relation of fellow-servant to the engineer and other employés on the train." The argument is a short one: The conductor of a train represents the company, and is not a fellow-servant with his subordinates on the train. The rule of the company provides that when there is no conductor, the engineer shall be regarded as a conductor. Therefore, in such case he represents the company, and is likewise not a fellow-servant with his subordinates. But this gives a potency to the rule of the company which it does not possess. The inquiry must always be directed to the real powers and duties of the official and not simply to the name given to the office. The regulations of a company cannot make the conductor a fellow-servant with his subordinates,

and thus overrule the law announced in the *Ross case.* Neither can it, by calling some one else a conductor, bring a case within the scope of the rule there laid down. In other words, the law is not shifted backwards and forwards by the mere regulations of the company, but applies generally, irrespectively of all such regulations. There is a principle underlying the decision in that case, and the question always is as to the applicability of that principle to the given state of facts.

What was the *Ross case*, and what was decided therein? The instruction given on the trial in the Circuit Court, which was made the principal ground of challenge, was in these words: "It is very clear, I think, that if the company sees fit to place one of its employés under the control and direction of another, that then the two are not fellow-servants engaged in the same common employment, within the meaning of the rule of law of which I am speaking." The language of that instruction, it will be perceived, is very like that of the one here complained of, and if this court had approved that instruction as a general rule of law, it might well be said that that was sufficient authority for sustaining this and affirming the judgment. But though the question was fairly before the court, it did not attempt to approve the instruction generally, but simply held that it was not erroneous as applied to the facts of that case. This is evident from this language, found in the latter part of the opinion, (p. 394,) and which is used in summing up the conclusions of the court: "We agree with them in holding — and the present case requires no further decision — that the conductor of a railway train, who commands its movements, directs when it shall start, at what stations it shall stop, at what speed it shall run, and has the general management of it, and control over the persons employed upon it, represents the company, and, therefore, that, for injuries resulting from his negligent acts, the company is responsible. If such a conductor does not represent the company, then the train is operated without any representative of its owner. If, now, we apply these views of the relation of the conductor of a railway train to the company, and to the

subordinates under him on the train, the objections urged to the charge of the court will be readily disposed of. Its language in some sentences may be open to verbal criticism; but its purport touching the liability of the company is, that the conductor and engineer, though both employés, were not fellow-servants in the sense in which that term is used in the decisions." It is also clear from an examination of the reasoning running through the opinion, for there is nowhere an argument to show that the mere fact that one servant is given control over another destroys the relation of fellow-servants. After stating the general rule, that a servant entering into service assumes the ordinary risks of such employment, and, among them, the risk of injuries caused through the negligence of a fellow-servant, and after referring to some cases on the general question, and saying that it was unnecessary to lay down any rule which would determine in all cases what is to be deemed a common employment, it turns to that which was recognized as the controlling fact in the case, to wit, the single and absolute control which the conductor has over the management of a train, as a separate branch of the company's business, and says (p. 390): "There is, in our judgment, a clear distinction to be made in their relation to their common principal, between servants of a corporation, exercising no supervision over others engaged with them in the same employment, and agents of the corporation, clothed with the control and management of a distinct department, in which their duty is entirely that of direction and superintendence. . . . We know from the manner in which railways are operated that, subject to the general rules and orders of the directors of the companies, the conductor has entire control and management of the train to which he is assigned. He directs when it shall start, at what speed it shall run, at what stations it shall stop, and for what length of time, and everything essential to its successful movements, and all persons employed on it are subject to his orders. In no proper sense of the term is he a fellow-servant with the fireman, the brakemen, the porters, and the engineer. The latter are fellow-servants in the running of the train under his direction; as to them and the train, he

stands in the place of and represents the corporation." And it quotes from Wharton's Law of Negligence, sec. 232*a*: "The true view is, that, as corporations can act only through superintending officers, the negligences of those officers, with respect to other servants, are the negligences of the corporation." And also from *Malone* v. *Hathaway*, 64 N. Y. 5, 12: "Corporations necessarily acting by and through agents, those having the superintendence of various departments, with delegated authority to employ and discharge laborers and employés, provide materials and machinery for the service of the corporation, and generally direct and control under general powers and instructions from the directors, may well be regarded as the representatives of the corporation, charged with the performance of its duty, exercising the discretion ordinarily exercised by principals, and, within the limits of the delegated authority, the acting principal."

The court, therefore, did not hold that it was universally true that, when one servant has control over another, they cease to be fellow-servants within the rule of the master's exemption from liability, but did hold that an instruction couched in such general language was not erroneous when applied to the case of a conductor having exclusive control of a train in relation to other employés of the company acting under him on the same train. The conductor was, in the language of the opinion, "clothed with the control and management of a distinct department;" he was "a superintending officer," as described by Mr. Wharton; he had "the superintendence of a department," as suggested by the New York Court of Appeals.

And this rule is one frequently recognized. Indeed, where the master is a corporation, there can be no negligence on the part of the master except it also be that of some agent or servant, for a corporation only acts through agents. The directors are the managing agents; their negligence must be adjudged the negligence of the corporation, although they are simply agents. So when they place the entire management of the corporation in the hands of a general superintendent, such general superintendent, though himself only an agent, is

almost universally recognized as the representative of the corporation, the master, and his negligence as that of the master. And it is only carrying the same principle a little further and with reasonable application, when it is held that, if the business of the master and employer becomes so vast and diversified that it naturally separates itself into departments of service, the individuals placed by him in charge of those separate branches and departments of service, and given entire and absolute control therein, are properly to be considered, with respect to employés under them, vice-principals, representatives of the master, as fully and as completely as if the entire business of the master was by him placed under charge of one superintendent. It was this proposition which the court applied in the *Ross case*, holding that the conductor of a train has the control and management of a distinct department. But this rule can only be fairly applied when the different branches or departments of service are in and of themselves separate and distinct. Thus, between the law department of a railway corporation and the operating department, there is a natural and distinct separation, one which makes the two departments like two independent kinds of business, in which the one employer and master is engaged. So, oftentimes there is in the affairs of such corporation what may be called a manufacturing or repair department, and another strictly operating department; these two departments are, in their relations to each other, as distinct and separate as though the work of each was carried on by a separate corporation. And from this natural separation flows the rule that he who is placed in charge of such separate branch of the service, who alone superintends and has the control of it, is as to it in the place of the master. But this is a very different proposition from that which affirms that each separate piece of work in one of these branches of service is a distinct department, and gives to the individual having control of that piece of work the position of vice-principal or representative of the master. Even the conclusion announced in the *Ross case* was not reached by a unanimous court, four of its members being of opinion that it was carrying the thought of a distinct

department too far to hold it applicable to the management of a single train.

The truth is, the various employés of one of these large corporations are not graded like steps in a staircase, those on each step being as to those on the step below in the relation of masters and not of fellow-servants, and only those on the same steps fellow-servants, because not subject to any control by one over the other. *Prima facie*, all who enter into the employ of a single master are engaged in a common service, and are fellow-servants, and some other line of demarcation than that of control must exist to destroy the relation of fellow-servants. All enter into the service of the same master, to further his interests in the one enterprise; each knows when entering into that service that there is some risk of injury through the negligence of other employés, and that risk, which he knows exists, he assumes in entering into the employment. Thus, in the opinion in the *Ross case*, p. 382, it was said: "Having been engaged for the performance of specified services, he takes upon himself the ordinary risks incident thereto. As a consequence, if he suffers by exposure to them he cannot recover compensation from his employer. The obvious reason for this exemption is, that he has, or, in law, is supposed to have, them in contemplation when he engages in the service, and that his compensation is arranged accordingly. He cannot, in reason, complain if he suffers from a risk which he has voluntarily assumed, and for the assumption of which he is paid."

But the danger from the negligence of one specially in charge of the particular work is as obvious and as great as from that of those who are simply co-workers with him in it. Each is equally with the other an ordinary risk of the employment. If he is paid for the one, he is paid for the other; if he assumes the one, he assumes the other. Therefore, so far as the matter of the master's exemption from liability depends upon whether the negligence is one of the ordinary risks of the employment, and, thus assumed by the employé, it includes all co-workers to the same end, whether in control or not. But if the fact that the risk is or is not obvious does not

control, what test or rule is there which determines? Right-
fully this, there must be some personal wrong on the part of
the master, some breach of positive duty on his part. If he
discharges all that may be called positive duty, and is himself
guilty of no neglect, it would seem as though he was absolved
from all responsibility, and that the party who caused the
injury should be himself alone responsible. It may be said
that this is only passing from one difficulty to another, as it
leaves still to be settled what is positive duty and what is
personal neglect; and yet, if we analyze these matters a little,
there will appear less difficulty in the question. Obviously, a
breach of positive duty is personal neglect; and the question
in any given case is, therefore, what is the positive duty of
the master? He certainly owes the duty of taking fair and
reasonable precautions to surround his employé with fit and
careful co-workers, and the employé has a right to rely upon
his discharge of this duty. If the master is careless in the
matter of employing a servant, it is his personal neglect; and
if without proper care in inquiring as to his competency he
does employ an incompetent person the fact that he has an
incompetent, and, therefore, an improper employé is a matter
of his personal wrong, and owing to his personal neglect.
And if the negligence of this incompetent servant works
injury to a co-servant, is it not obvious that the master's omis-
sion of duty enters directly and properly into the question of
responsibility? If, on the other hand, the master has taken
all reasonable precautions to inquire into the competency of
one proposing to enter into his service, and as the result of
such reasonable inquiry is satisfied that the employé is fit and
competent, can it be said that the master has neglected any-
thing, that he has omitted any personal duty; and this, not-
withstanding that after the servant has been employed it shall
be disclosed that he was incompetent and unfit? If he has
done all that reasonable care requires to inquire into the
competency of his servant, is any neglect imputable to him?
No human inquiry, no possible precaution, is sufficient to
absolutely determine in advance whether a party under certain
exigencies will or will not do a negligent act. So it is not

possible for the master, take whatsoever pains he may, to
secure employés who will never be guilty of any negligence.
Indeed, is there any man who does not sometimes do a negli-
gent act? Neither is it possible for the master, with any
ordinary and reasonable care, always to secure competent and
fit servants. He may be mistaken, notwithstanding the rea-
sonable precautions he has taken. Therefore, that a servant
proves to be unfit and incompetent, or that in any given
exigency he is guilty of a negligent act resulting in injury
to a fellow-servant, does not of itself prove any omission of
care on the part of the master in his employment; and it is
only when there is such omission of care, that the master can
be said to be guilty of personal wrong in placing or continuing
such servant in his employ, or has done or omitted aught
justifying the placing upon him responsibility for such em-
ployé's negligence.

Again, a master employing a servant impliedly engages
with him that the place in which he is to work and the tools
or machinery with which he is to work, or by which he is to
be surrounded, shall be reasonably safe. It is the master who
is to provide the place and the tools and the machinery, and
when he employs one to enter into his service he impliedly
says to him that there is no other danger in the place, the
tools and the machinery, than such as is obvious and necessary.
Of course, some places of work and some kinds of machinery
are more dangerous than others, but that is something which
inheres in the thing itself, which is a matter of necessity, and
cannot be obviated. But within such limits the master who
provides the place, the tools, and the machinery owes a positive
duty to his employé in respect thereto. That positive duty
does not go to the extent of a guarantee of safety, but it does
require that reasonable precautions be taken to secure safety,
and it matters not to the employé by whom that safety is
secured, or the reasonable precautions therefor taken. He
has a right to look to the master for the discharge of that
duty, and if the master, instead of discharging it himself, sees
fit to have it attended to by others, that does not change the
measure of obligation to the employé, or the latter's right to

insist that reasonable precaution shall be taken to secure safety in these respects. Therefore it will be seen that the question turns rather on the character of the act than on the relations of the employés to each other. If the act is one done in the discharge of some positive duty of the master to the servant, then negligence in the act is the negligence of the master; but if it be not one in the discharge of such positive duty, then there should be some personal wrong on the part of the employer before he is held liable therefor. But, it may be asked, is not the duty of seeing that competent and fit persons are in charge of any particular work as positive as that of providing safe places and machinery? Undoubtedly it is, and requires the same vigilance in its discharge. But the latter duty is discharged when reasonable care has been taken in providing such safe place and machinery, and so the former is as fully discharged, when reasonable precautions have been taken to place fit and competent persons in charge. Neither duty carries with it an absolute guaranty. Each is satisfied with reasonable effort and precaution.

In the case of *Atchison, Topeka &c. Railroad* v. *Moore*, 29 Kansas, 632, 644, Mr. Justice Valentine, speaking for the court, thus succinctly summed up the law in these respects: "A master assumes the duty towards his servant of exercising reasonable care and diligence to provide the servant with a reasonably safe place at which to work, with reasonably safe machinery, tools, and implements to work with, with reasonably safe materials to work upon, and with suitable and competent fellow-servants to work with him; and when the master has properly discharged these duties, then, at common law, the servant assumes all the risks and hazards incident to or attendant upon the exercise of the particular employment or the performance of the particular work, including those risks and hazards resulting from the possible negligence and carelessness of his fellow-servants and co-employés. And at common law, whenever the master delegates to any officer, servant, agent, or employé, high or low, the performance of any of the duties above mentioned, which really devolve upon the master himself, then such officer, servant, agent, or employé

stands in the place of the master; and becomes a substitute for the master, a vice-principal, and the master is liable for his acts or his negligence to the same extent as though the master himself had performed the acts or was guilty of the negligence. But at common law, where the master himself has performed his duty, the master is not liable to any one of his servants for the acts or negligence of any mere fellow-servant or co-employé of such servant, where the fellow-servant or co-employé does not sustain this representative relation to the master."

It would be easy to accumulate authorities on these propositions, for questions of this kind are constantly arising in the courts. It is enough, however, to refer to those in this court. In the cases of *Hough* v. *Railway Company*, 100 U. S. 213, and *Northern Pacific Railroad* v. *Herbert*, 116 U. S. 642, this court recognized the master's obligation to provide reasonably suitable place and machinery, and that a failure to discharge this duty exposed him to liability for injury caused thereby to the servant, and that it was immaterial how or by whom the master discharged that duty. The liability was not made to depend in any manner upon the grade of service of a co-employé, but upon the character of the act itself, and a breach of the positive obligation of the master. In both of them the general doctrine of the master's exemption from liability for injury to one servant through the negligence of a co-employé was recognized, and it was affirmed that the servant assumed all the risks ordinarily incident to his employment. In *Railroad Company* v. *Fort*, 17 Wall. 553, where a boy was injured through dangerous machinery in doing an act which was not within the scope of his duty and employment, though done at the command of his immediate superior, this court, while sustaining the liability of the master, did so on the ground that the risk was not within the contract of service, and that the servant had no reason to believe that he would have to encounter such a danger, and declared that the general rule was that the employé takes upon himself the risks incident to the undertaking, among which were to be counted the negligence of fellow-servants in the same employment. In the cases of

*Randall* v. *Balt. & Ohio Railroad,* 109 U. S. 478, and *Quebec Steamship Co.* v. *Merchant,* 133 U. S. 375, the persons whose negligence caused the injury were adjudged to be fellow-servants with the parties injured, so as to exempt the master from liability ; and while the question in this case was not there presented, yet in neither case were the two servants doing the same work, although it is also true that in each of them there was no control by one over the other. It may safely be said that this court has never recognized the proposition that the mere control of one servant over another in doing a particular piece of work destroys the relation of fellow-servants, and puts an end to the master's liability. On the contrary, all the cases proceed on the ground of some breach of positive duty resting upon the master, or upon the idea of superintendence or control of a department. It has ever been affirmed that the employé assumes the ordinary risks incident to the service; and, as we have seen, it is as obvious that there is risk from the negligence of one in immediate control as from one simply a co-worker. That the running of an engine by itself is not a separate branch of service, seems perfectly clear. The fact is, all the locomotive engines of a railroad company are in the one department, the operating department; and those employed in running them, whether as engineers or firemen, are engaged in a common employment and are fellow-servants. It might as well be said that, where a liveryman has a dozen carriages, the driver of each has charge of a separate branch or department of service, and that if one drives his carriage negligently against another employé the master is exempt from liability.

It may further be noticed that in this particular case the injury was not in consequence of the fireman's obeying any orders of his superior officer. It did not result from the mere matter of control. It was through negligence on the part of the engineer in running his engine, and the injury would have been the same if the fireman had had nothing to do on the locomotive, and had not been under the engineer's control. In other words, an employé carelessly manages an engine, and another employé who happens to be near enough is in-

jured by such carelessness. It would seem, therefore, to be the ordinary case of the injury of one employé through the negligence of another.

Again, this was not simply one of the risks assumed by the employé when entering into the employment, and yet not at the moment fully perceived and understood. On the contrary, the peril was known and voluntarily assumed. The plaintiff admits in his testimony that he knew they had no right to the track without orders, and that there was a local train on the road somewhere between them and Bellaire; and yet, with this knowledge, and without protest, he voluntarily rode on the engine with the engineer. *Hammond* v. *Railway Company*, 83 Michigan, 334; *Railway Company* v. *Leach*, 41 Ohio St. 388; *Wescott* v. *Railroad Co.*, 153 Mass. 460.

In the first of these cases, the party injured was a section hand, who was injured while riding on a hand-car, in company with a fellow-laborer and the section foreman, and the negligence claimed was in propelling the hand-car along a curved portion of the track, with knowledge of an approaching train, and without sending a lookout ahead to give warning. In respect to this, Mr. Justice Cahill, speaking for the court, says: "But if this conduct was negligent, it was participated in by Hammond. The latter had been going up and down this section of the road daily for three months. Whatever hazard there was in such a position was known to him, and he must be held to have voluntarily assumed it. . . . Where, as in this case, the sole act of negligence relied on is participated in, and voluntarily consented to by the person injured, with full knowledge of the peril, the question of the master's liability does not arise."

So, in this case, Baugh equally with the engineer knew the peril, and with this knowledge voluntarily rode with the engineer on the engine. He assumed the risk.

For these reasons we think that the judgment of the Circuit Court was erroneous, and it must be.

*Reversed and the case remanded for a new trial.*

MR. JUSTICE Field dissenting.

I am unable to concur in the judgment of reversal in this case. I think the judgment of the Circuit Court is correct in principle and in accordance with the settled law of Ohio, where the cause of action arose, which, in my opinion, should control the decision.

The plaintiff below, the defendant in error here, is a citizen of the State of Ohio, and the defendant, the Baltimore and Ohio Railroad Company, is a corporation created under the laws of Maryland. The present action was brought by the plaintiff in the Court of Common Pleas of the county of Belmont, in the State of Ohio. The defendant claimed citizenship in Maryland, by virtue of its incorporation in that State, and it petitioned for and obtained a removal of the action to the Circuit Court of the United States for the Southern District of Ohio. The plaintiff was a fireman on a locomotive of the defendant, which, on the 4th of May, 1885, had been employed in assisting a freight train from Bellaire in Ohio to the top of the grade, about twenty miles west of that place, when it was detached from the freight train to return to Bellaire. It would seem that by the regulations or usages of the company it was to return in conformity with orders from the train dispatcher, or upon information from him as to the use or freedom of the road, or, in the absence of such orders or information, by following close behind some regular scheduled train which would carry signals to notify trains coming in the opposite direction that the locomotive was following it. It does not appear what special orders or what information, if any, was on this occasion received by the engineer from the train dispatcher, and by his order the locomotive started back without following any scheduled train. He appears to have relied upon his ability to avoid the train possibly coming in the opposite direction by going upon a side track and waiting until it passed. The result was that the locomotive on its way collided with the regular local passenger train, which was running on its schedule time and had the right of the road. In the collision the plaintiff below was injured to such an extent that his right arm had to be amputated near the shoulder and he was rendered unable to use his

right leg in walking. To recover damages for the injuries sustained he brought the present action against the railroad company, and the question presented is whether the company was liable for the injuries. He obtained a verdict for $6750; for which, and costs, judgment was entered in his favor.

The locomotive, with the tender attached to it, was called a helper, because it was used in helping trains up the grade from Bellaire. After it was detached from the train helped, it passed under the direction of the engineer, who was from that time its conductor by appointment under the regular rules of the company. The ninth rule provides that "trains are run under the charge of the conductors thereof, and their directions relative to the management of trains will be observed, except in cases where such directions may be in violation of the rules of this company or of safety, in which cases engineers will call the attention of the conductors to the facts as understood by them, and decline compliance; conductors and enginemen being in such cases held equally responsible." And the tenth rule provides that "whenever a train or engine is run without a conductor the engineman [that is, the engineer] thereof will also be regarded as conductor, and will act accordingly." The engineer was thus invested from that time with the powers and duties of a conductor. He could then control the movements of the locomotive, and, in the absence of special orders, direct when it should start on its return to Bellaire, the places at which it should stop, and the speed with which it should proceed. The position that the company could not alter its relations to the engineer and those under his direction by such appointment does not rest upon any tenable ground. There certainly is no substantial reason why the company may not at any time constitute one of its employés a conductor of an engine or train. It is a matter resting in its discretion to appoint a conductor or to remove him from that position at any time. The duties and liabilities of the officer and his relations to the company depend upon the nature of the office which he at the time holds, not upon his duties and relations in a previously existing employment. If the corporation acting by its directors,

either by special designation or by established rule, appoint a person as conductor, generally or for a limited time, he takes the duties and incurs the responsibilities of the appointment from that date. The person previously a subordinate or co-employé becomes thereby the superior of the fellow-laborer in his powers and changed in his relations to the company. To say that he continues in his previous subordination and relationship to the company would be like stating that a common soldier taken from the ranks and put in command of a company or regiment of which he was a member still retains his subordinate relations to his former fellow-soldiers and to the commander-in-chief. To hold that an engineer in the position placed by the rule of the company did not become a conductor in fact is refusing to give effect to the express terms of the rule. It is declaring that he shall not be what the established rule of the company declares he shall be. I do not think that this position can be maintained.

A conductor of a train or engine is, by the very nature of the office, its manager and director in the particular service in which it is employed within the general regulations of the company. He directs, subject to such general regulations, when the train or engine shall start, at what speed it shall travel, what special route it shall take within the designated limits of the company, and, when necessary, may designate who shall be employed under him. In the case before us he represented the company in all these respects; otherwise the company was without a representative on the helper, which will not be contended. In its management, he, as conductor, stood in the place of the company, and if any one was injured by his negligence in the discharge of his duties, the company was responsible.

The court below instructed the jury in substance as follows: That the law assumes that where a person enters into any employment he takes the risks incident to that employment so far as they may result from the nature of the employment itself, or from the negligence or default of his fellow-servants, that is, of those who are not placed in authority and control over him, but who occupy substantially the same relation to

the company as he does; but that if an injury results to an employé from the negligence or carelessness on the part of one placed in authority over the employés of the company so as to direct and control them, the company is liable; that, therefore, if the engineer and the fireman were fellow-servants, as thus described, the plaintiff could not recover; but that, if the engineer was the agent or representative of the company and the fireman acted under his direction and was subject to his orders, and the injury resulted from the default or negligence or wrong of the engineer, then it must be attributed to the company as the negligence, default, or wrong of the company.

In thus instructing the jury the court followed the law as settled by the decisions of the Supreme Court of Ohio — in which State the cause of action arose and the case was tried — that the company was liable if the negligence was by one acting in the character of its representative or agent in directing and controlling the movements of the locomotive, and the party injured was subject to his orders. Any other ruling would have been at variance with those decisions. The law of Ohio on the matter under consideration was the law to control. The courts of the United States cannot disregard the decisions of the state courts in matters which are subjects of state regulation. The relations of employés, subordinate to the directors of the company but supervising and directing the labors of others under them, to their principals, and the liability of the principals for the negligent acts of their subordinate supervising and directing agents, are matters of legislative control, and are in no sense under the supervision or direction of the judges or courts of the United States. There is no unwritten general or common law of the United States on the subject. Indeed, there is no unwritten general or common law of the United States on any subject. (See Tucker's Blackstone, vol. 1, Appendix, 422, 433.) The common law may control the construction of terms and language used in the Constitution and statutes of the United States, but creates no separate and independent law for them. The federal government is composed of independent States, "each of

which," as said in *Wheaton* v. *Peters*, 8 Pet. 591, 658, "may have its local usages, customs and common law. There is no principle which pervades the Union, and has the authority of law, that is not embodied in the Constitution or laws of the Union. The common law could be made a part of our federal system only by legislative adoption. When, therefore, a common-law right is asserted, we must look to the State in which the controversy originated." And there are few subjects upon which there is such diversity of opinion and conflict of decision, not merely between the courts and judges of the different States, but between the judges of the federal courts, as the liability of employers for the negligent acts of their subordinate agents, having control and direction of servants in a common employment under them. Even as to what shall be deemed a common employment, Mr. Beach, a leading writer on contributory negligence, states that there are many "hundreds of clearly irreconcilable decisions." Conceding that a Federal court, sitting within a State where the law relating to the subject under consideration is unsettled and doubtful, must exercise an independent judgment and declare the law upon the best light it can obtain, this rule has no application where the law of the State is neither unsettled nor doubtful, but is established and certain, and recognized as such by its judicial authorities. While, as we have indicated, there is no general or common law throughout the country — that is, of the United States — as to the extent and limits of the liability of a corporation to its employés in the case of a common employment under a supervising and directing agent, in Ohio the law on the subject is neither uncertain nor doubtful; it has been settled there for many years. In *Little Miami Railroad* v. *Stevens*, 20 Ohio, 415, it was held by the Supreme Court of that State, over forty years ago, that where an employer placed one in his employ under the direction of another, also in his employ, such employer was liable for injury to the person placed in a subordinate situation by the negligence of his superior; and that decision has been adhered to ever since. There a railroad company had placed an engineer in its employ under the control of a conductor of one of its trains, who directed

when the cars were to start and when to stop, and it was held liable for an injury received by him caused by the negligence of the conductor.  A collision had occurred by reason of the omission of the conductor to inform the engineer of a change of place ordered in the passing of trains.  The company claimed exemption from liability on the ground that the engineer and conductor were fellow-servants, and that the engineer had assumed by his contract the risk of the negligence of the conductor, and also that public policy forbade a recovery in such cases; but the court rejected both positions. In *Cleveland, Columbus &c. Railroad* v. *Keary*, 3 Ohio St. 201, the same court affirmed the doctrine thus declared, and held that where a brakeman in the employ of a railroad company, on a train under the control of a conductor having exclusive command, was injured by the carelessness of the conductor, the company was responsible, holding that the conductor was the representative of the company upon which rested the obligation to manage the train with skill and care. In its opinion the court said no service was common that did not admit a common participation, and no servants were fellow-servants when one was placed in control over the other.   In *Berea Stone Co.* v. *Kraft*, 31 Ohio St. 287, 292, decided in 1877, that court held that a master was liable for an injury to a servant resulting from the negligence of a superior servant. There the corporation was organized to quarry and manufacture stone, and, whilst in the employment of the company and engaged in loading stone on its cars, one of the employés received an injury through the carelessness and negligence of an agent and servant of the company in the selection and use of unsafe and dangerous implements and machinery for the purpose of loading the stone upon the cars for transportation. The unsafe and defective machinery was selected by the foreman of the quarry.  It was contended that the foreman and the laborers under him were fellow-servants, but the court held that the foreman, occupying substantially the relation of principal, was in no just or proper sense a fellow-servant, nor in what might be properly denominated a common service, and said: "The relation existing between them was such as

brings the case clearly within the rule established by repeated adjudications of this court and now *firmly settled in the jurisprudence of the State:* that where one servant is placed by his employer in a position of subordination to and subject to the orders and control of another, and such inferior servant, without fault, and while in the discharge of his duties, is injured by the negligence of the superior servant, the master is liable for such injury." It will be observed that the court states in this opinion that the rule of liability was then firmly settled in the jurisprudence of the State. If any rule of law can be considered as settled by judicial decisions, that rule is settled as the law of Ohio. The question is not whether that is the best law for Ohio, but whether it is the law of that State. It will be time to consider of its change or improvement when that matter is submitted to us, which is not yet. If the law were expressed in a statute, no Federal court would presume to question its efficacy and binding force. The law of the State on many subjects is found only in the decisions of its courts, and when ascertained and relating to a subject within the authority of the State to regulate, it is equally operative as if embodied in a statute, and must be regarded and followed by the federal courts in determining causes of action affected by it arising within the State. *Bucher* v. *Cheshire Railroad,* 125 U. S. 555; *Detroit* v. *Osborne,* 135 U. S. 492, 497. For those courts to disregard the law of the State as thus expressed upon any theory that there is a general law of the country on the subject at variance with it, in cases where the causes of action have arisen in the State, and which, if tried in the state courts, would be governed by it, would be nothing less than an attempt to control the State in a matter in which the State is not amenable to Federal authority by the opinions of individual Federal judges at the time as to what the general law ought to be, — a jurisdiction which they never possessed, and which, in my judgment, should never be conceded to them. That doctrine would inevitably lead to a subversion of the just authority of the State in many matters of public concern. It would also be in direct conflict with section 721 of the Revised Statutes, which declares that "the laws of the several States,

except where the Constitution, treaties, or statutes of the
United States otherwise require or provide, shall be regarded
as rules of decision in trials at common law in the courts of
the United States, in cases where they apply." This provision
is a reënactment of section 34 of the original Judiciary Act.
1 Stat. 73, 92, c. 20. Under the term "laws," as here mentioned,
are included not merely those rules and regulations having the
force of law which are expressed in the statutes of the States,
but also those which are expressed in the decisions of their
judicial tribunals. The latter are far more numerous and touch
much more widely the interests and rights of the citizens of a
State in their varied relations to each other and to society in
the acquisition, enjoyment, and transmission of property, and
the enforcement of rights and redress of wrongs. The term
"laws" in the Constitution and the statutes of the United States
is not limited solely to legislative enactments unless so declared
or indicated by the context. When the Fourteenth Amend-
ment ordains that no State shall deny to any person within its
jurisdiction "the equal protection of the laws" it means equal
protection not merely by the statutory enactments of the
State, but equal protection by all the rules and regulations
which, having the force of law, govern the intercourse of its
citizens with each other and their relations to the public, and
find expression in the usages and customs of its people and in
the decisions of its tribunals. The guaranty of this great
amendment, "as to the equal protection of the laws," would
be shorn of half of its efficacy, if it were limited in its applica-
tion only to written laws of the several States, and afforded
no protection against an unequal administration of their un-
written laws. It has never been denied, that I am aware of,
that decisions of the regular judicial tribunals of a State,
especially when concurring for a succession of years, are, at
least, evidence of what the law of the State is on the points
adjudged. The law, being thus shown, is as obligatory upon
those points in another similar case, arising in the State, as if
expressed in the most formal statutory enactments. If this is
not so, I may ask, in anticipation of what I may say hereafter,
what becomes of the judicial independence of the States?

The doctrine that the application of the so-called general and unwritten law of the country to control a state law, as expressed by its courts, in conflict with it, has the sanction of Congress by its supposed knowledge of the decisions of this court to that effect, and its subsequent silence respecting them, does not strike me as having any persuasive force. The silence of Congress against judicial encroachments upon the authority of the States cannot be held to estop them from asserting the sovereign rights reserved to them by the Tenth Amendment of the Constitution. Such silence can neither augment the powers of the general government nor impair those of the States. Silence by one or both will not change the Constitution and convert the national government from one of delegated and limited powers, or dwarf the States into subservient dependencies. Acquiescence in or silence under unauthorized power can never give legality to its exercise under our form of government.

Marshall, when a member of the Virginia convention called to consider the question of the adoption of the Constitution of the United States, in answer to an inquiry as to the laws of what State a contract would be determined, answered: "By the laws of the State where the contract was made. According to those laws, and those only, can it be decided." 3 Elliott's Debates, 556.

Judge Tucker, in the appendix to the first volume of his edition of Blackstone, says that the common law has been variously administered or adopted in the several States. Is the Federal judicial department to force upon these States views of the common law which their courts and people have repudiated? I cannot assent to the doctrine that there is an atmosphere of general law floating about all the States, not belonging to any of them, and of which the Federal judges are the especial possessors and guardians, to be applied by them to control judicial decisions of the state courts whenever they are in conflict with what those judges consider ought to be the law.

The present case presents some singular facts. The verdict and judgment of the court below were in conformity with the

law of Ohio, in which State the cause of action arose and the case was tried, and this court reverses the judgment because rendered in accordance with that law, and holds it to have been error that it was not rendered according to some other law than that of Ohio, which it terms the general law of the country. This court thus assumes the right to disregard what the judicial authorities of that State declare to be its law, and to enforce upon the State some other conclusion as law which it has never accepted as such, but always repudiated. The fireman, who was so dreadfully injured by the collision caused by the negligence of the conductor of the engine, that his right arm had to be amputated from the shoulder and his right leg was rendered useless, could obtain some remedy from the company by the law of Ohio as declared by its courts, but this court decides, in effect, that that law, thus declared, shall not be treated as its law, and that the case shall be governed by some other law which denies all remedy to him. Had the case remained in the state court, where the action was commenced, the plaintiff would have had the benefit of the law of Ohio. The defendant asked to have the action removed, and obtained the removal to a Federal court because it is a corporation of Maryland, and thereby a citizen of that State by a fiction adopted by this court that members of a corporation are presumed to be citizens of the State where the corporation was created, a presumption which, in many cases, is contrary to the fact, but against which no averment or evidence is held admissible for the purpose of defeating the jurisdiction of a Federal court. *Louisville Railroad Co.* v. *Letson*, 2 How. 497; *Cowles* v. *Mercer County*, 7 Wall. 118; *Paul* v. *Virginia*, 8 Wall. 168, 178; *Steamship Co.* v. *Tugman*, 106 U. S. 118, 120. Thus in this case a foreign corporation not a citizen of the State of Ohio, where the cause of action arose, is considered a citizen of another State by a fiction, and then, by what the court terms the general law of the country, but which this court held in *Wheaton* v. *Peters*, has no existence in fact, is given an immunity from liability in cases not accorded to a citizen of that State under like circumstances. Many will doubt the wisdom of a system which permits such a vast

difference in the administration of justice for injuries like those in this case, between the courts of the State and the courts of the United States.

I am aware that what has been termed the general law of the country — which is often little less than what the judge advancing the doctrine thinks at the time should be the general law on a particular subject — has been often advanced in judicial opinions of this court to control a conflicting law of a State. I admit that learned judges have fallen into the habit of repeating this doctrine as a convenient mode of brushing aside the law of a State in conflict with their views. And I confess that, moved and governed by the authority of the great names of those judges, I have, myself, in many instances, unhesitatingly and confidently, but I think now erroneously, repeated the same doctrine. But, notwithstanding the great names which may be cited in favor of the doctrine, and notwithstanding the frequency with which the doctrine has been reiterated, there stands, as a perpetual protest against its repetition, the Constitution of the United States, which recognizes and preserves the autonomy and independence of the States — independence in their legislative and independence in their judicial departments. Supervision over either the legislative or the judicial action of the States is in no case permissible except as to matters by the Constitution specially authorized or delegated to the United States. Any interference with either, except as thus permitted, is an invasion of the authority of the State and, to that extent, a denial of its independence. As said by this court, speaking through Mr. Justice Nelson, " the general government and the States, although both exist within the same territorial limits, are separate and distinct sovereignties, acting separately and independently of each other, within their respective spheres. The former in its appropriate sphere is supreme; but he States within the limits of their powers not granted, or, in the language of the Tenth Amendment, ' reserved,' are as independent of the general government as that government within its sphere is independent of the States." *The Collector* v. *Day,* 11 Wall. 113, 124.

To this autonomy and independence of the States their legislation must be as free from coercion as if they were separated entirely from connection with the Union. There must also be the like freedom from coercion or supervision in the action of their judicial authorities. Upon all matters of cognizance by the States, over which power is not granted to the general government, the judiciary must be as free in its action as the courts of the United States are independent of the state courts in matters subject to Federal cognizance. "Such being the separate and independent condition of the States in our complex system, as recognized by the Constitution, and the existence of which is so indispensable, that, without them, the general government itself would disappear from the family of nations, it would seem to follow," as said by the court in the case cited, " as a reasonable, if not a necessary, consequence, that the means and instrumentalities employed for carrying on the operations of their governments, for preserving their existence, and fulfilling the high and responsible duties assigned to them in the Constitution, should be left free and unimpaired, should not be liable to be crippled, much less defeated, by the taxing power of another government," to which we may add, nor by the supervision and action of another government in any form. "We have said," continues the court in the same case, " that one of the reserved powers was that to establish a judicial department; it would have been more accurate, and in accordance with the existing state of things at the time, to have said the power to maintain a judicial department. All of the thirteen States were in possession of this power, and had exercised it at the adoption of the Constitution; and it is not pretended that any grant of it to the general government is fo d in that instrument. It is, therefore, one of the sovereign powers vested in the States by their constitutions, which remained unaltered and unimpaired, and in respect to which the State is as independent of the general government as that government is independent of the States."

Such being the nature of the judicial department, and the free exercise of its powers being essential to the independence

of the States, how can it be said that its decisions as to the law of the State, upon a matter subject to its cognizance, can be ignored and set aside by the courts of the United States for the law or supposed law of another State or sovereignty, be it the general or special law of that State or sovereignty? If a Federal court exercise its duties within one of the States where the law on the subject under consideration is uncertain and unsettled, "where," as Chief Justice Marshall said, "the state courts afford no light," it must, as we have already stated, exercise an independent judgment thereon, and pronounce such judgment as it deems just. But no foreign law, or law out of the State, whether general or special, or any conception of the court as to what the law ought to be, has any place for consideration where the law of the State in which the action is pending is settled and certain. A law of the State of that character, whether expressed in the form of a statute or in the decisions of the judicial department of the government, cannot be disregarded and overruled, and another law, or notion of what the law should be, substituted in its place without a manifest usurpation by the Federal authorities. I cannot permit myself to believe that any such conclusion, when more fully examined, will ultimately be sustained by this court. I have an abiding faith that this, like other errors, will, in the end "die among its worshippers."

The independence of the States, legislative and judicial, on all matters within their cognizance is as essential to the existence and harmonious workings of our Federal system, as is the legislative and judicial supremacy of the Federal government in all matters of national concern. Nothing can be more disturbing and irritating to the States than an attempted enforcement upon its people of a supposed unwritten law of the United States, under the designation of the general law of the country, to which they have never assented and which has no existence except in the brain of the Federal judges in their conceptions of what the law of the States should be on the subjects considered.

The theory upon which inferior courts of the United States take jurisdiction within the several States is, when a right is

not claimed under the Constitution, laws, or treaties of the United States, that they are bound to enforce, as between the parties, the law of the State. · It was never supposed that, upon matters arising within the States, any law other than that of the State would be enforced, or that any attempt would be made to enforce any other law. It'was never sup- posed that the law of the State would be enforced differently by the Federal courts sitting in the State, and the state courts; that there could be one law when a suitor went into the state courts and another law when the suitor went into the Federal courts, in relation to a cause of action arising within the State — a result which must necessarily follow if the law of the State can be disregarded upon any view which the Federal judges may take of what the law of the State ought to be rather than what it is.

As said by the Supreme Court of Pennsylvania at an early day — as far back as 1798 — "the government of the United States forms a part of the government of each State." *Respublica* v. *Cobbett*, 3 Dall. 473. To which the same court, over a half century later, added: "It follows that its courts are the courts of each State; they administer justice according to the laws of the State as construed and settled by its own supreme tribunal. This has been more than once solemnly determined by the Supreme Court of the Union to be the rule of their decision, whenever the construction of the Constitution of the United States, treaties, or acts of Congress does not come in question." *Commonwealth* v. *Pittsburg and Connells- ville Railroad*, 58 Penn. St. 44.

In *Shelby* v. *Guy*, 11 Wheat. 361, 367, this court, in consider- ing the meaning to be given to the words "beyond the seas," in a statute of limitations of Tennessee, said: "That the stat- ute laws of the States must furnish the rule of decision to this court so far as they comport with the Constitution of the United States in all cases arising within the respective States, is a position that no one doubts. Nor is it questionable that a fixed and received construction of their respective statute laws, in their own courts, makes, in fact, a part of the statute law of the country, however we may doubt the propriety of

that construction. It is obvious that this admission may, at times, involve us in seeming inconsistencies, as, where States have adopted the same statutes and their courts differ in the construction. Yet that course is necessarily indicated *by the duty imposed on us to administer, as between certain individuals, the laws of the respective States, according to the best lights we possess of what those laws are.*"

In *Beauregard* v. *New Orleans*, 18 How. 497, 502, which was before us in 1855, this court, in speaking through Mr. Justice Campbell, said: "The constitution of this court requires it to follow the laws of the several States as rules of decision wherever they properly apply. And the habit of the court has been to defer to the decisions of their judicial tribunals upon questions arising out of the common law of the State, especially when applied to the title of lands. No other course could be adopted with any regard to propriety. Upon cases like the present the relation of the courts of the United States to a State is the same as that of its own tribunals. They administer the laws of the State, and to fulfil that duty they must find them as they exist in the habits of the people and in the exposition of their constituted authorities. *Without this the peculiar organization of the judicial tribunals of the States and the Union would be productive of the greatest mischief and confusion.*"

The position that the plaintiff, the fireman, voluntarily assumed the risk in this case, because he knew the helper had no right to the track without orders, and there was possibly a local train somewhere on the track, by continuing on the train instead of leaving it, does not strike me as having much force. It was not considered of sufficient importance to be called to the attention of the court below, or of the jury. Its suggestion now seems to be an afterthought of counsel. It is not positively shown that any special orders as to the movement of the helper on its return, or any information as to the use or freedom of the road, were received by the engineer from the train dispatcher; but the fireman had no actual knowledge on that point, though he had a right to presume that such was the case, from the fact that immediately upon the receipt of

an order given to the conductor, at Burr's Mills, the latter
directed that the helper start back. Nor did the fireman have
any actual knowledge whether the train he was directed to
follow was or was not a regular scheduled train, though he
had a right to presume that it was, from the orders of the
conductor. His information as to what was known, and con-
sequently directed or omitted, by the engineer on that subject
was too imperfect for him to act upon it. His continuance as
fireman on the locomotive after its movement to return to
Bellaire was not with sufficient knowledge of any failure of the
engineer to give the proper orders as to a scheduled train to
justify an abandonment of the locomotive. It was under the
direction of the engineer, not of the fireman, and he may have
felt confident that it could be run on a side track if necessary
to avoid any possible collision with a train coming in the
opposite direction, as was sometimes done. It would be a
dangerous notion to put into the heads of firemen and other
employés of a railroad company that if they had reason to
believe, without positive information on the subject, that
dangers attended the course pursued by the movements of the
train under the direction of its conductor, they would be
deemed to assume the risk of such movements if they did not
expostulate with him, and, if he did not heed the expostula-
tion, leave the train, even after it had commenced one of its
regular trips. A strange set of legal questions would arise,
more embarrassing to the courts than the fellow-servant
question, if such action should be deemed essential to the
retention by the employé of the right to claim indemnity for
injuries which might follow from the course pursued. If the
employés could abandon a train after it had commenced one
of its regular trips when they had reason to believe, without
absolute information, that danger might attend their continu-
ance on it, new strikes of employés would spring up to embar-
rass the commerce of the country and annoy the community,
founded upon such alleged apprehensions. The circumstances
attending the cases in which an employé has been held to
have voluntarily assumed the risks of an irregular, improper
or ill-advised movement of a train, under directions of its

conductor, are essentially different from those of the case before us. The testimony in the record, upon which the allegation is made that the fireman voluntarily assumed the risks taken by the engineer with knowledge of their existence, is of the most flimsy and unsatisfactory character conceivable. It only discloses general ignorance by him of what the engineer did, or of information upon which he acted, as will be seen by its perusal. The allegation, which is founded upon a few broken and detached sentences, loses its entire force when the context is read. The whole testimony bearing upon this subject is given in the note below.[1]

---

[1] The detached and broken sentences, upon which the allegation is made that the plaintiff voluntarily assumed the risk in the case, are printed in italics in the passage from the record in which they are given below with their context:

As to orders received on the morning the train started back to Bellaire:

Record, p. 40. — " Q. Now, Mr. Baugh, do you know of any orders that was received that morning by your train? A. Yes, sir.

" Q. What do you know of? A. All I know is an order thrown off while we were at Burr's Mills, and I gave it to the engineer, and he told me to let him out; that we would go.

" Q. What was that order? A. I don't know.

" Q. Do you know what it was? A. No, sir.

" Q. What happened immediately after you gave your engineer that order? A. He told me to let him out.

" Q. What did happen immediately after you gave that order to the engineer? A. He started to go.

" Q. Who opened the switch? A. I did it.

" Q. What did you do then? A. Shut the switch and got on the engine."

\* \* \* \* \* \* \*

Record, p. 41. — " Q. Do you know what time it was when you started out of the switch at Burr's? A. No, sir.

" Q. Did you know then what time of day it was? A. No, sir.

" Q. Did you pay any attention to that at all? A. No; I did not. It was not my business to pay attention.

" Q. Well, I was going to ask you was that any part of your duty? A. No, sir.

" Q. Whose direction were you under? A. Under my engineer's.

" Q. Did you receive any orders as you went west that morning at Lewis' Mills? A. I don't know.

" Q. On your helper, who received the orders? A. The engineer did. He received all the orders."

Record, p. 47. — " Q. Now, Mr. Baugh, when you got up to Burr's Mills,

It only remains to notice the observations made upon the decision in the *Ross case*, which seem to me to greatly narrow

to that turn-table, just explain to the jury the process by which that engine would get back to Bellaire? A. We had all the trains on the road to contend with, and we had to run inside tracks when coming down to keep out of the way of them.

" Q. When did you first learn the fact that you had to keep out of· the way — out of the way of what trains? A. All the trains that was expected.

" Q. The schedule trains, would it not be? A. I reckon.

" Q. *What was the process — what right had you to go back after you got to Burr's Mills or the turn-table? You had no right to the track at all unless you had orders, had you?* A. *No, sir; didn't have no right without orders.*

" Q. And you proposed to get a right to the track by writing an order which you have said you did write? A. I was going to flag on the engine. I did not want to run them on my orders.

" Q. You had been running the length of time, whatever it was; you knew the time of this local train out of Bellaire? A. No, sir.

" Q. You were in the habit of meeting it? A. I did not know what time they left.

" Q. You knew where you met them always? A. No, sir; we would not meet them perhaps once in a month. · We would not meet them once a month sometimes.

" Q. You knew the time of the local train? A. No, sir.

" Q. You knew there was a local train on the road running out of Bellaire in the morning? A. Yes, sir.

" Q. You knew when you were running — knew where you met them? A. I did not know anything about it that time.

" Q. Is it not a part of your duty to learn these things? I want to know if you did·not know that there was a local train and has been for the last ten years running out of Bellaire about the same time — about the same hour and the same minute. A. No, indeed; I did not.

" Q. And you were at work at — in the shops and yard and did not know anything about it? A. No, sir; I did not.

" Q. You entirely overlooked that fact? No answer."

*         ·*          *          *          *        ·*          ·

Record, p. 49. — " Q. *Did you know that there was a local train coming out about that time?* A. I knew there was a local train on the road some place.

" Q. Between you and Bellaire? A. Yes, sir.

" Q. I wish you would explain to the jury what you mean by. flagging. You say your intention was to flag down to Bellaire. How is that done? A. We make out an order and give it to the engineer on the train we want to follow; sign the engineer's name; and I went with this flag on the train, and our engine followed behind until we met another train, and then we would side track there and pass.

" Q. That is, you would keep far enough ahead so that if you met a train you would signal it and stop the train? A. I would go right on the train that had the right of way of the track and our engine followed after."

its effect and destroy its usefulness as a protection to em-
ployés in the service of large corporations, under the direction
and control of supervising agents.    That was an action
brought by a locomotive engineer in the employ of the Chi-
cago, Milwaukee and St. Paul Railroad Company to recover
damages for injuries received in a collision which was caused
by the negligence of the conductor of the train.    The com-
pany claimed exemption from liability on the ground that the
conductor and engineer were fellow-servants; but the court
charged the jury that it was clear that if the company saw
fit to place one of its employés under the control and direction
of another, then the two were not fellow-servants engaged in
the same common employment, within the meaning of the
rule of law which was the subject of consideration, and that
by its general order the company made the engineer, in an
important sense, subordinate to the conductor.    To this charge
exceptions were taken.    The correctness of the charge was
the question discussed in the case by counsel, and determined
by the court.    Its correctness was necessarily sustained, by
the judgment of affirmance, which could not have been ren-
dered if the exceptions to it were well taken.    The majority
of the court in their opinion, whilst admitting that the charge
is much like the one in the present case, and might be well
said to be sufficient authority for sustaining and affirming the
judgment, contend that the court did not attempt to approve
the instruction generally, but simply held that it was not
erroneous as applied to the facts of the case, and in support
of this view cite the language of the court used to show that
the conductor of a railway company, exercising certain author-
ity, represents the company, and, therefore, for injuries result-
ing from his negligent acts the company was responsible, and
the statement that the case required no further decision.
Clearly, it did not require any further decision, for it covers
the instruction objected to, that if the company saw fit to
place one of its employés under the control and direction of
another, then the two were not fellow-servants engaged in the
same employment within the meaning of the rule of law as
to fellow-servants.    A conductor of a railway company, direct-

ing the movements of its train, and having its general management, illustrates the general doctrine asserted and sought to be maintained throughout the opinion in the *Ross case*, that railroad companies in their operations, extending in some instances hundreds and even thousands of miles, and passing through different States, must necessarily act through superintending agents; employés subordinate to the company, but superior to the employés placed under their direction and control. The necessity of this doctrine of subordinate agencies standing for and representing the company was well illustrated in the duties and powers of a conductor of a train or engine. They were stated as an illustration of the necessity and wisdom of the rule, and not to weaken or narrow the general doctrine asserted in the decision of the court, and which its opinion, in almost every line, attempted to maintain. The necessity of subordinate agencies exists whenever a train or engine is removed from the immediate presence and direction of the head officers of the company.

The opinion of the majority not only limits and narrows the doctrine of the *Ross case*, but, in effect, denies, even with the limitations placed by them upon it, the correctness of its general doctrine, and asserts that the risks which an employé of a company assumes from the service which he undertakes is from the negligence of one in immediate control, as well as from a co-worker, and that there is no superintending agency for which a corporation is liable, unless it extends to an entire department of service.

A conclusion is thus reached that the company is not responsible in the present case for injuries received by the fireman from the negligent acts of the conductor of the engine.

There is a marked distinction in the decisions of different courts upon the extent of liability of a corporation for injuries to its servants from persons in their employ. One course of decisions would exempt the corporation from all responsibility for the negligence of its employés, of every grade, whether exercising supervising authority and control over other employés of the company, or otherwise. Another course of

decisions would hold a corporation responsible for all negligent acts of its agents, subordinate to itself, when exercising authority and supervision over other employés. The latter course of decisions seems to me most in accordance with justice and humanity to the servants of a corporation.

I regret that the tendency of the decision of the majority of the court in this case is in favor of the largest exemptions of corporations from liability. The principle in the *Ross case* covers this case, and requires, in my opinion, a judgment of affirmance.

Mr. Chief Justice Fuller dissenting.

I dissent because, in my judgment, this case comes within the rule laid down in *Chicago, Milwaukee &c. Railway* v. *Ross*, 112 U. S. 377, and the decision unreasonably enlarges the exemption of the master from liability for injury to one of his servants by the fault of another.