### CALLAWAY v. ALLEN.

(Circuit Court of Appeals, Seventh Circuit. November 27, 1894.)

#### No. 175.

MASTER AND SERVANT—NEGLIGENCE—DANGEROUS MACHINERY.

Where a servant is injured by the careless use by his fellow servants of a machine which is not necessarily dangerous, if properly used, and which is not furnished by the master, but by a fellow servant, against the master's orders, the master is not liable therefor.

Appeal from the Circuit Court of the United States, for the Southern District of Illinois.

Action by John Allen, administrator of the estate of Charles Allen, deceased, against S. R. Callaway, receiver of the Toledo & Kansas City Railroad Company. Plaintiff obtained judgment. Defendant appeals.

This is an action for damages for negligently causing the death of Charles Allen, appellee's decedent. In an action to foreclose a mortgage against the railroad company in the circuit court, appellee intervened by petition for the allowance of a claim by the receiver of said railroad company for $5,000 on account of such death. On motion of petitioner, the cause was referred to a master to take testimony and report. Subsequently, the case was set down by the court for trial by a jury, trial had, and a verdict of $5,000 rendered in favor of the petitioner, and a decree entered by the court. Objections were taken to the trial on the ground that no issue had been properly framed out of chancery, and that the trial was irregular; but as an appeal was taken from the decree, and the cause has been argued here upon the merits, it will be considered and decided in the same way,—that is, upon the merits, as they appear from the law and the testimony. The verdict of the jury, being advisory only, and for the information of the court, was not conclusive upon the facts in the court below, and is not in this court.

The ground of the action is the alleged negligence of the receiver in not furnishing safe and competent machinery and appliances for the decedent to work with, and in not informing him of the defective and dangerous character of that furnished, whereby the accident resulting in his death was caused.

Charles Allen, the decedent, was killed while in the employment of the receiver, upon said railroad, on the 1st day of July, 1892, while at work with a gang of men in the construction of a bridge and trestlework near a place called Coffeen, in Montgomery county, Ill. The receiver was at that time in general charge of, and was operating, the road. There was also a general superintendent, Arthur L. Mills, who had charge of the operating department, maintenance of way, including the bridge department, and transportation. The general superintendent was also purchasing agent, and had general charge of the purchase of supplies, tools, and machinery. There was under him one J. E. Johnson, who was master of the bridge and building department, as an independent department. Under Johnson were several gangs of men,—among others, the one where decedent worked,—who worked under bridge foremen appointed for that purpose by the superintendent of bridges. These foremen were under the direction of the master of bridges and buildings, and acted as boss of the particular work each had in charge

for the time, in the absence of the master of bridges and buildings. He employed his own men, subject to the approval of the master of bridges, and was authorized to discharge them for cause. In the absence of his superior, he controlled the mode and manner of work, subject to the supervision and approval of the same authority. The machinery, tools, and appliances deemed necessary for the work of the bridge department were purchased by the general superintendent, and furnished by him, through the master of bridges, to the foremen and their men. There is no complaint in the case that the machinery actually furnished by the superintendent for the work on this bridge was not safe and sufficient. The bridge and trestlework, several hundred feet in length and in the highest place about 40 feet above the ground, was being constructed over a ravine. Among the machinery and implements so furnished were certain push cars, being small flat cars propelled by hand; the men in charge walking behind or at the side, and pushing them with their hands. These were used by the men to carry timbers from one end of the trestlework out upon the bridge, for the purpose of being put into its construction, and, so far as anything appears, were safe and proper for such purpose. But it required hard labor to load and unload the timbers upon and from these cars by hand. Some two months before the accident, one Thompson, acting as a bridge foreman at another place, without the knowledge or authority of the receiver or the superintendent, or the superintendent of bridges and buildings, constructed from waste material a labor-saving addition to one of these push cars, which consisted in a V-shaped frame or platform with diagonal braces, designed to be placed upon and used with the car. Upon this platform was constructed a windlass, with rope and pulley, and at one end of the rope a hook. This rope passed through the pulley and wound upon the windlass in such a manner that the free end of the rope hung out over the push car when the machine was in use. The device was designed to lift bridge timbers, transport them to the point upon the work where needed, and deposit them there. This was done by attaching a chain to the hook in the end of the rope, and encircling the timber with the other end, and lifting it by means of the pulley and windlass. The timber, when so raised, would be carried forward by pushing the car to the desired place, and then unloaded and put in place by releasing the cranks of the windlass, and lowering the timber by means of the rope and derrick. But these timbers, being suspended more upon one side, required something on the other side of the car to counterbalance; otherwise, there was danger of unloading truck, frame, timbers, and all into the ravine below. For this purpose, the men were accustomed to pile timbers upon the other edge of the truck, or, more commonly, to seat men, as live weight, to counterbalance the load. On the occasion in question, the men, under charge of Charles Anderson, as foreman, loaded upon this instrument, and by these means, three large oak pieces, each 18 feet long, 18 inches wide, and 7 inches in thickness, weighing nearly, but not quite, a ton, and carried them to the place of deposit. This was more than they had ever attempted to carry before. They had theretofore carried two such pieces of oak, or three of pine. On that day, Allen was engaged and at work with other employés, as a bridge carpenter, at that place, not in transporting, but in framing, the timbers. The men engaged in loading them, having some difficulty in raising them by the device in question, called upon Allen to "give them a lift," which he did. He got upon the platform on the push car, to assist in lifting the timbers, or to act as a counterbalance to their weight when raised, or both, perhaps, and remained upon the platform, with three other employés, while the car was being pushed to its place over the center of the depression. One end of the stringers extended diagonally across the track in the rear of the car, and the stringers were held steady by one of the gang until the car had reached the proper place for deposit. When the car stopped, the man who was steadying the timbers pushed one end of them out over the side of the car and trestle so that they hung suspended beyond the trestle, and about parallel with the track. At this moment, for some reason,—whether from so swinging the timbers out beyond the trestle, or from some change in the position of the men, who, with Allen, were performing the office of live weight to counterbalance the stringers,

is not entirely clear,—the timbers proved too heavy for the counterbalance, and the car and platform began gradually to tilt, and finally upset, and fell with Allen to the bottom of the gulf, the other men escaping by jumping off in time. A prior foreman, one Thompson, had constructed and used the platform and windlass device at another place. It was brought to this trestle by Foreman Anderson, and used under his direction. Neither the receiver nor superintendent, nor superintendent of bridges and buildings, authorized its construction or use. On the contrary, whenever the attention of Johnson, the master of bridges, had been called to it, he had forbidden its use, and only a few days prior to the accident he told Anderson to throw it away. He did not put the prohibition of its use on the ground of its being dangerous, but on the ground that it retarded the work, and more could be accomplished without it than with it.

Brown & Geddes (Clarence Brown, of counsel), for appellant.
J. A. Connolly and T. C. Mather, for appellee.

Before WOODS and JENKINS, Circuit Judges, and BUNN, District Judge.

BUNN, District Judge (after stating the facts as above). The principal questions in the case are whether the device constructed by Foreman Thompson and afterwards used by Foreman Anderson, was of itself an unsafe and dangerous device, and, if so, whether its being such was the primary cause of the accident, and whether the receiver was responsible for its use upon the occasion in question. We do not understand that it was contended by counsel for appellee on the oral argument, or in the printed brief, that Anderson, the foreman of the gang, was a vice principal of the receiver. This proposition could not be maintained, in view of the decision of the supreme court in Railroad Co. v. Baugh, 149 U. S. 368, 13 Sup. Ct. 914. Anderson was not in any sense the head of any department of the service. He, as well as the men with him, was working under the supervision and direction of Johnson, the superintendent of bridges and buildings. Johnson and the general superintendent of the road, under the receiver, were, so far as appears, the only ones who could be considered as standing, so far as this bridge device was concerned, in the place of the receiver. The following illustration by the court in the Baugh Case seems entirely applicable here:

"So sometimes there is, in the affairs of such a corporation, what may be called a manufacturing or repair department, and another strictly operating department. These two departments are, in relation to each other, as distinct and separate as though the work of each was carried on by a separate corporation. And from this natural separation flows the rule that he who is placed in charge of such separate branch of the service—who alone superintends and has control of it—is, as to it, in the place of the master. But this is a very different proposition from that which affirms that each separate piece of work in one of these branches of service is a distinct department, and gives to the individual having control of that piece of work the position of vice principal or representative of the master."

But, as we understand the contention of the appellee, it is this: That it is the absolute duty of the master to furnish safe and suitable machinery and appliances; that this duty cannot be delegated; and that, therefore, when the foremen, Thompson and Anderson, constructed this dangerous device, and used it, the receiver became

liable for its use, though it was wholly unknown to him, and neither himself nor his general superintendent, nor superintendent of bridges and buildings, had provided it, or authorized its use. This contention, we think, is not maintainable. A railroad corporation must act through its agents, and, where a railroad is in the hands of a receiver, the receiver represents the company, and acts through its agents in the same way. Of course, the receiver must use all reasonable care to provide suitable machinery. The evidence shows that he did so provide in this case. The employés, however, were not satisfied with it; and they themselves provided something in addition that would make the work of lifting timbers easier for them, though the evidence showed that it was rather a hindrance than a help to the progress of the work. It is true, the superintendent of bridges knew that this device had been used, and its use had been forbidden by him; and he had very recently told Foreman Anderson to throw it away, and that if he used it he should hold him responsible. Anderson insisted on using it because it was easier on the men, to which the superintendent replied that he (Anderson) was picking up two stringers 600 feet from the bridge, when, without his device, he could carry six or eight, and it took him two weeks to do what he could do without it in one. On the third day before the accident, the superintendent of bridges came to Coffeen, and again found the men using the car with this attachment. They were going out on the bridge, four men on one platform with one stringer, and two men pushing, when he told Anderson to throw the thing to one side and break it up. The objection to its use seemed to be founded wholly upon its want of effectiveness in aiding the work. No suggestion was made by Johnson or the men that it was not safe. The most that can be said of the superintendent is that he did not succeed in stopping the use of the device. Probably, his objection that it retarded the work may have been the reason why the men afterwards tried to carry three stringers at a time instead of one and two, as they had done before. We do not think, under the circumstances, that the receiver should be held liable for the use of this device. He neither furnished it, nor authorized its use. It could not be expected that he or the superintendent should be present at all times and at all places to see that such a device was not used, or that they should take means to destroy it, or prevent its use by force. The orders of the superintendent were disobeyed and his wishes disregarded by the employés, and the responsibility for its use should rest with them.

But assuming that the superintendent had, by implication or otherwise, authorized its use, still we think there can be no recovery. The primary cause of the accident was the careless and negligent use of the car by Anderson and the men under him. The weight of evidence is clear that the car, with the added superstructure, was not ordinarily or necessarily dangerous, if carefully handled and not overloaded. Any machine may be made dangerous if wrongfully or negligently used. The evidence shows clearly that the car was overloaded. The timbers were too heavy for the counterbalancing weight, and that was the fault of coemployés,

and was the primary and controlling cause of the accident. For these reasons, without considering the question of the danger being open and apparent, and the hazard being assumed by decedent, the decree is reversed, and the cause remanded to the circuit court, with directions to enter a decree in favor of the appellant.