## HUNT v. HURD.

(Circuit Court of Appeals, Seventh Circuit. January 2, 1900.)

### No. 606.

**1. RAILROADS—INJURY OF EMPLOYE—FLYING SWITCHES.**

The making of a flying switch by a railroad company in its yards in the daytime, and in the usual manner, is not negligence per se as to an employé working in the yards, who is familiar with the practice to make such switches therein; and the fact that a safer method might have been adopted affords no ground for a recovery for the death of such employé by being struck by a car so switched, where he was given notice of its approach.

**2. FEDERAL COURTS—FOLLOWING STATE DECISIONS—FELLOW SERVANTS.**

The question whether employés are fellow servants, so as to preclude a recovery from the master by one for the negligence of the other, is one

of general law, as to which a federal court is not bound by the decisions of the courts of the state.[1]

### In Error to the Circuit Court of the United States for the Southern District of Illinois.

This is an action by the administrator of Edward M. Hurd against Samuel Hunt, receiver of the Toledo, St. Louis & Kansas City Railroad Company, for damages arising from the death of said Hurd, a section hand, at Coffeen, Ill., on February 8, 1898. The declaration is in two counts, which are substantially alike, charging the defendant company with negligence in carelessly and negligently making a running or flying switch, and, without notice or warning to Hurd, causing a car to run upon the side track upon which he was working, throwing him down, passing over him, and causing his death. At the time of the accident Hurd had been in the employ of the receiver for about four months, working as a section hand in the yards of the company at Coffeen and immediate vicinity. Coffeen is a village of about 1,000 inhabitants. The main track of the railroad company runs through the village, east and west, crossed at right angles by Main street and other streets running north and south. A short distance west of Main street is the depot. Sixty feet west of the depot is a side track or "passing track," so called, which leaves the main track, and extends west through the village north of, and parallel with, the main track. A track called a "house track" joins this side track at a point 180 feet from the west end of the depot, and extending in an easterly direction over Main street. About 1,080 feet west of the depot is situated the coal shaft of the Coffeen Coal Copper Company. For the purpose of handling the business of this coal shaft another side track leaves the main track at a distance of about 210 feet west of the depot, running parallel with the main track to the coal shaft. About 330 feet from the coal shaft two short side tracks branch out from this track, running parallel with it past the coal shaft, and rejoining the side track at a point about 390 feet west of the shaft. All of the tracks south of the main track were at the time of the accident used for loading and shipping coal from the coal shaft. There are two other railroads crossing between the coal shaft and the depot. Prior to the accident Hurd and a fellow workman, James Crites, were engaged in tightening bolts on the side track. Both were working under the orders of William Jones, foreman of the section. Between 2 and 3 o'clock p. m., a local freight train came into the yards from the east, stopping east of the depot. As there was a car of coal to be taken from the coal shaft and shipped out with this train, the engine was detached, and the remainder of the train left standing east of the Main street crossing while the engine went up the side track to the coal shaft to get this car. The section gang, among whom was Hurd, were then at work on the side track. When the engine went up to the coal shaft, the men stepped off the track, resuming their work after the engine had passed. The foreman, Jones, was standing close to Hurd when the train passed, and Crites was standing about 40 feet east of Hurd. There were three cars of coal standing on the side track near the coal shaft, the one to be shipped out in this train being the furthest west. The engine coupled onto this string of three cars and started east towards the depot; the intention being to drop the last car, which was a flat car loaded with slack, upon the house track, north of the depot, by detaching it from the string before the engine reached the switch, allowing the engine and two cars attached to pass out onto the main track, and then, before the detached car reached the switch, setting the switch for the house track, allowing that car to run onto that track by the momentum it had acquired before its detachment. The engine could then return with the two cars onto the side track, leaving them at the place where they had been previously picked up, and bring out the car from the house track, and couple it to the train left on the main track east of the depot. A brakeman was placed on the last car, and the engine, with all

---

[1] As to state laws as rules of decision in federal courts, see notes to Griffin v. Wheel Co., 9 C. C. A. 548; Wilson v. Perrin, 11 C. C. A. 71; Hill v. Hite, 29 C. C. A. 553.

three cars attached, returned towards the depot. When this train was about five or six hundred feet from the section gang where Hurd was working, Jones, the foreman, told the men to get off the track and to stay out of the way; that the train crew were going to drop a car back, or to throw a car in there,—the exact words being differently given by different witnesses. The import of the warning, however, was that a car was going to be placed on the house track by a process known to railroad men as a drop or flying switch. When the engine was about 100 feet from the place where the men were working, they stepped off the track, and about the same time the brakeman on the last car uncoupled that car from the string the engine was pulling. To do this, the speed of the engine was slackened, in order to allow the drawing of the pin; and after the pin was drawn the speed of the engine was increased, so that the engine and two cars passed the sectionmen at the rate of about four or five miles an hour, according to the testimony of the witnesses Jones and Benson, or eight to ten miles an hour, according to the evidence of other witnesses. The sectionmen were standing on the main track when the engine and two cars passed them. The engine and cars were running two or three car lengths ahead of the detached car. As soon as the engine with the cars attached had passed him, Hurd, without looking to the west, from whence the car was coming, stepped upon the switch track, astride of the south rail, and bent down, apparently for the purpose of proceeding with his work. The detached car was then rapidly approaching, and was within 30 feet of him. Several bystanders shouted to him to get out of the way, but it was too late, and the car struck him and passed over him, killing him almost instantly. The accident happened between 2 and 3 o'clock on a clear day. The brakeman on the detached car was standing at the west end of the car, where the brake was placed, and, by reason of his position, probably would not be able to see Hurd when he stepped upon the track. The car was stopped just after it passed the switch onto the house track. During the time of Hurd's employment, the coal company was shipping all of its coal over the Toledo, St. Louis & Kansas City Railroad, and a great deal of switching was done in those yards, there being as many as 15 to 20 cars taken from the coal shaft and scales daily. In doing this work, running switches were of almost daily occurrence, and they had been frequently made in Hurd's presence. There is no substantial conflict in the testimony, or any dispute as to the facts of the case. The questions arising from the record are questions of law. The defendant company called but one witness, Section Foreman Jones, whose testimony in all material matters supports the plaintiff's proofs. At the close of the testimony the defendant's counsel requested the court to direct the jury to find a verdict in favor of the defendant, which request the court refused, but submitted the case to the jury, who found a verdict in favor of the plaintiff. The principal assignment of error, and the only one which we deem it necessary to consider, is founded upon this refusal of the court to take the case from the jury.

Clarence Brown, for plaintiff in error.

George R. Cooper, for defendant in error.

Before WOODS, Circuit Judge, and BUNN and SEAMAN, District Judges.

BUNN, District Judge, after making the foregoing statement of the case, delivered the opinion of the court.

It is impossible to discover any rational or satisfactory ground upon which this verdict can be sustained. There was no evidence in the case that the switching of cars upon side tracks by a running switch is of itself dangerous or unlawful. It is not claimed to be the law that such a practice is unjustifiable, or constitutes negligence per se on the part of the railroad company. The truth is that it is the common practice in most or all of the railroad yards in the country. It is claimed in this case that a separate engine

could have been attached to these particular cars, and the cars drawn behind or shoved ahead of such engine with greater safety to employés and the public. That is quite possible. If an employé will not take heed to such a warning as was given Hurd in this case, —to get off the track and keep off,—he might be saved by the fury of an approaching engine, and the noise of a whistle and the ringing of a bell. But this does not furnish any solution to the question. Because the business might be done in some other and slower way, less dangerous, it does not follow that the method employed involves negligence. The real question is whether the method is the one in general use by other railroad companies, and is reasonbly safe. If it is, then it is not negligence of itself, and without regard to circumstances, to employ that method. 3 Elliott, R. R. par. 1162; Kelley v. Railroad Co., 53 Wis. 74, 9 N. W. 816; Schaible v. Railway Co., 97 Mich. 318, 56 N. W. 565, 21 L. R. A. 660. A railroad company has, say, a half dozen or more cars standing in its yards, which it wishes to place upon as many different side tracks. Instead of hitching a separate engine to each car, and taking the car where it is wanted, it attaches one engine to the entire train. When all is under motion the engine is suddenly slacked up. This slack is communicated from the engine through all the intermediate cars until it reaches the rear car. This enables the brakeman to draw the pin and detach that car just at a point before it reaches the first switch, which is drawn at the proper moment, allowing the detached car to go upon another track by the momentum received from the engine. The engine with the remaining cars proceed upon their way until another side track and switch are reached, when the same process is repeated, and so on until all the cars are deposited in their proper places. Where there are no public streets to be crossed, and the traveling public are not concerned, it cannot be said that such a method of moving cars is extrahazardous, or implies any negligence on the part of the company. It facilitates business, and that is what the public want, although the danger may be somewhat increased over that of slower methods. It would, no doubt, be less dangerous to employés and to the public if all passenger trains should be run at a speed not exceeding 10 miles an hour, instead of from 30 to 60 miles an hour, and yet no one would venture the opinion that it should be held as negligence per se to run trains at the higher rate of speed. The business public demands it, notwithstanding the extra hazard. There is no doubt that under some circumstances it would be gross carelessness to shunt a train upon a side track, leaving it to run across a grade crossing over a public street where footmen were constantly passing, without an engine and an engineer to control it. The cases cited from Illinois, and relied upon by the defendant in error, are, for the most part, cases of this kind, where the traveling public are interested, and where there are grade railroad crossings over public streets. But there are no such extraordinary circumstances in this case. Here the switching was done in the defendant's yards, upon its own private grounds. It was done in the usual manner, in broad daylight. The deceased was an employé of the company. He had

worked in those yards several months, and had seen, and must have well known of, this practice of making flying switches. He was distinctly notified by his foreman to get off and keep off the track, as they were going to make a drop switch upon that track. All the other employés took heed to the warning, except Hurd. He paid enough attention to it to get off with the others until the engine and two attached cars passed, and then, forgetting or for some reason being totally oblivious of the approach of the shunted car, stepped upon the track, apparently to resume his work of fastening bolts. The other workmen, Jones and Crites, knew about the danger, and heeded it. Hurd knew just as much about it as they did, but was the only one who paid no attention to or failed to realize the danger.

It is said that the jury are to judge of the circumstances, and draw their own inferences from facts. This is true, where there are circumstances and testimony from which inferences may properly be drawn. But the difficulty lies in the fact that there are no circumstances in evidence from which the inference of negligence on the part of the company, or of any employé of the company, can properly be drawn. The court, in its general charge, instructed the jury:

"That they were to judge in the first place (for that is most important) whether this so-called running or flying switch was such an operation of the road, or of the switch, or switching of cars, as was reasonably compatible with the safety of the parties employed to work there. If it was reasonably safe, then the party employing the deceased, perhaps, had complied with his undertaking; but if it was not a reasonably safe operation, so to speak, of the engine and cars,—of the switching process that was going on there,—then perhaps the defendant would be guilty."

This instruction and others of a similar import were objected to, and exception thereto taken by defendant's counsel. We mention these things here only for the purpose of saying that it seems altogether probable, from these instructions and from the verdict, that the jury supposed they were authorized to say that if they found these flying switches to be dangerous, or more dangerous than other methods that might have been employed, in that case they should find the defendant company guilty of negligence. But this, as we have seen, cannot be the law. And apparently the jury must also have found that the contributory negligence of the deceased in going upon the track in front of a moving car after being warned by his foreman of the danger would not prevent a recovery, if the jury found this method of switching dangerous. The instructions, however, on the subject of contributory negligence were quite correct and full. It is true that there is evidence to show that the yard was within the corporate limits of a village of 1,000 or 1,200 inhabitants, and that 30 or 40 feet away was a public street crossing. But how can these facts change or influence the duty of the company to the employé Hurd? Not at all. If he had been a traveler upon the public crossing, then the question in regard to the propriety of switching a car over the crossing without an engine attached would have some significance.

As we have seen, the charges of negligence in the declaration are

of a very general character. No specific negligence is alleged on the part of the engineer or brakeman or other employé in charge of the switching train. The charge is apparently one of negligence on the part of the company for operating cars in that way, as though it were negligence per se. And the question seems to have been left to the jury as a question of fact, though there are no circumstances in the case tending in any way to show negligence, unless it was the bare fact of switching cars by a flying switch, so that the jury were in reality left to determine the law as well as the fact.

Counsel for defendant in error lay some stress upon the fact that the brakeman sent in charge of the shunted car was located on the rear end of the car, instead of the front. But he was where his brake was by which the car was controlled, and he was not there for the purpose of giving warning. Other means were provided for that. But assume that the brakeman was negligent in not being in the right place. It is quite clear that the plaintiff cannot recover for the negligence of the brakeman or foreman or other employés in charge of the train. They were fellow workmen with the deceased. This is not a question of local law, as is claimed by counsel for the defendant in error, but is one of general law, to be determined by a reference to all the authorities. Railroad Co. v. Baugh, 149 U. S. 368, 13 Sup. Ct. 914, 37 L. Ed. 772. And the decisions of the United States supreme court are controlling upon this question. Martin v. Railroad Co., 166 U. S. 399, 17 Sup. Ct. 603, 41 L. Ed. 1051; Railroad Co. v. Peterson, 162 U. S. 346, 16 Sup. Ct. 843, 40 L. Ed. 944; Same v. Charless, 162 U. S. 359, 16 Sup. Ct. 848, 40 L. Ed. 999. These cases are quite conclusive of the case at bar, so far as any question of negligence on the part of the engineer or brakeman in charge of the train is concerned, if any such negligence were charged or proven. But no such negligence is charged, and, if it were, there is no evidence tending to support the charge. The judgment of the circuit court is reversed, and the case remanded, with instructions to award a new trial.