EDWARD MAHER, Respondent, *v.* ATLANTIC STEVEDORING CO., INC., Appellant.

First Department, January 20, 1922.

Ships and shipping — action by longshoreman to recover for injuries caused by hatch cover falling on him while stowing cargo in hold of vessel — State rules as to procedure apply to action — rules of maritime law as to contributory negligence, acts of fellow-servants, and measure of damages govern — rule that master must furnish reasonably safe place to work applicable — question whether reasonably safe place furnished is for jury — rule of assumption of risk not applicable.

An action by a longshoreman to recover damages for injuries caused by hatch covers falling upon him while he was stowing a cargo in the hold of a ship, which was lying in navigable waters of the United States, may be brought in the courts of this State. The rules of practice, pleading and evidence of our courts apply, and the cause must be tried in conformity therewith.

In such an action, however, the rules relating to contributory negligence, acts of fellow-servants and the measure of recovery must be determined by the maritime law and not by the common law.

The defendant was, by the rules of the maritime law, under the duty to furnish to the plaintiff, a longshoreman, a reasonably safe place in which to work.

The question whether the defendant had furnished the plaintiff with a reasonably safe place to work was properly submitted to the jury, and their finding against the defendant is supported by the evidence.

While the plaintiff assumed the risk of such dangers as were open and obvious in connection with the actual work of stowing the cargo within the hold of the vessel, he did not assume any risk occasioned by the defendant's

failure to furnish him with a reasonably safe place to work and did not, therefore, assume the risk that the hatch covers were not properly secured in place and might be displaced by the action of the hoist used in lowering the cargo into the hold.

APPEAL by the defendant, Atlantic Stevedoring Co., Inc., from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of New York on the 23d day of May, 1921, upon the verdict of a jury for $35,000, and also from an order entered in said clerk's office on the same day denying defendant's motion to set aside the verdict and for a new trial made upon the minutes.

*A. G. Maul [G. Everett Hunt* of counsel], for the appellant.

*Abraham Oberstein [Moses Feltenstein* of counsel], for the respondent.

DOWLING, J.:

Plaintiff, who is a longshoreman, was working as a " holdman " for defendant, which is a domestic corporation engaged in the business of stevedoring and doing longshore work, including the loading and unloading of cargoes in the city of New York. On August 31, 1919, defendant was engaged in loading a steamship at Pier 37, East river, borough of Brooklyn, with barrels of oil from a lighter lying alongside the vessel. Plaintiff had gone to work Saturday morning, and the accident in question happened on Sunday afternoon while he was in the hold, stowing away a barrel of oil. There were five hatches in all on the ship. The hatches were divided into three sections and were covered with hatch covers which were about seven feet long, three feet wide and four or five inches thick, each cover weighing about 150 pounds; one end rested on the iron beams or strong backs which separated the hatch into sections, and the other end rested on the hatch coaming; there was also a socket in the coaming. The strong backs, weighing about 2,500 or 3,000 pounds each, were the width of the hatch and about seven feet deep, resting to the extent of three feet in grooves prepared to receive them, so that about four feet of the strong back extended above the top of the groove and the surface of the deck. Thus, when the hatch covers were in place, they projected

four feet above the deck.   By the procedure followed on this vessel at the time in question, these strong backs were entirely unsecured, save as they were held in place by the groove and by the pressure of the hatch covers upon them.   No means had been provided for securing the strong backs by any additional device.   Plaintiff was working in the hold under hatch No. 2, which was approximately eighteen or twenty feet long by fourteen or sixteen feet wide.   The hatch covers and beams had been removed from two sections thereof.   Over the hatch covers on the still covered section was spread a heavy tarpaulin concealing from view all beneath it.   There were about seven or eight of these covers.   The two sections which had been removed for the operation of loading were the aft sections, leaving the forward section covered.   This work was done under the direction of Olsen, defendant's general stevedore, who at the time of the accident was taking the place of the defendant's main superintendent who was away on his vacation.   When the two aft strong backs were removed to open up the hold space it was done by means of a winch.

The loading of barrels of oil on the vessel was done by means of a single steam winch.   A rope sling was put around two barrels of oil at a time, and this sling was caught by an iron hook, open, twelve or fourteen inches wide, the open part thereof being from eight to ten inches wide.   This hook was attached to the end of a steel cable which was raised by means of the steam winch, so that the barrels of oil were then raised from the lighter and lowered into the hold under the operation of the winchman.   The deck crew in connection with this part of the work consisted of three men; a winchman, an extra winchman who was not working at the time, but who was a relief man, and the gangway man, whose duty it was to give the winchman a signal with his hand when to go ahead and when to stop, as well as when to raise or lower. This gangway man stood over the hatch, so that he knew from his own observation when to give the required signals.   When the barrels reached the bottom of the hold, they were taken in charge by the holdmen, of whom at the time there were eight, under the direction of a hatch foreman.   As the barrels are raised from the lighter, the winchman does his work, the boom swings over the hatch and the barrels are then lowered

into the hold. Thereupon the holdmen loosen the two barrels of oil from the hook, the gangway man signals the winchman to go ahead, the cable is raised, and as the hook swings as it comes up the gangway man takes hold of the hook and passes it over the side to the man on the lighter. This is the ordinary way of conducting such an operation. But there is always danger that, as the open hook is swinging as it comes up to the deck, the gangway man may have some difficulty in securing it. To do this work he is furnished with what is called a " monkey stick " to reach out and secure the hook. There is testimony that no one can ever tell exactly where the hook is going to swing, as it comes up at different angles and the position it occupies depends to some extent on the way in which the man below, who holds the hook, starts it on its return.

Plaintiff, a holdman (which is next to the lowest position in longshore work), had no experience either as winchman, gangway man, or in any higher position; his business was only to stow the freight in the hold. At the time in question he was engaged in stowing a barrel of oil, that is, rolling it where it was to be stored. He was in what is called the " square of the hatch " right under the beam, when, as he was rolling a barrel in, he was hit on the head by a number of the hatch covers that had covered the remaining section of hatch No. 2 and which fell upon him from a distance of thirty or thirty-five feet, from the level of the deck to the floor of the hold.

The fall of these hatch covers had been caused by the hook catching and fouling in the remaining beam or strong back, then resting unsecured in its grooves, as the result of which, under the continued operation of the winch and the hoisting of the hook, one end of the strong back had been carried clear of its resting place and was suspended on the hook, causing the tarpaulin and covers to become displaced and fall to the bottom of the hold below. The gangway man at the time was standing some three feet from the beam and saw the hook swing towards it, whereupon he signaled the winchman to stop and the winchman did shut off steam " in a way, but not enough so as not to lift the beam up from the socket." The gangway man shouted, " Look out below," but the covers had already fallen.

First Department, January, 1922.    [Vol. 199

There was testimony that the winch was in bad working condition due to the escape of steam, as the result of which it would not stop instantly, but would keep going for a couple of seconds, which, while it would not affect the loading, would prevent an instantaneous emergency stop. The winchman had complained of this condition to the hatch foreman of defendant, who referred him to the general stevedore and acting superintendent, to whom in turn he reported the defect and also the danger of the hook catching when it could not be stopped; but the only reply was to keep on working, as nothing could be done until steam was turned off.

There is no doubt that the danger of the hook catching in one of these beams is a well-known and ever-present one, and that wherever there is a swinging hook and an unattached beam there is danger of the hook coming up and pulling the beam out of place. Nor was the removal of the last beam a lengthy operation, for it could have been done within fifteen minutes.

There was evidence that in the particular kind of work being done at the time on this vessel it was customary to remove all the hatch covers when loading, except with the particular steamship line for which this work was being done. There was also testimony that, where a beam was left, it was customary to bolt it in or secure it in some way by stringing or tying it. Such customary ways of doing the work in question were denied by defendant's witnesses.

There could be no question of any contributory negligence of the plaintiff under the facts established upon the trial. Though the theory of defendant's liability was originally based, first upon the failure to provide plaintiff with a reasonably safe place in which to work, and second in furnishing a defective appliance, to wit, the steam winch, the case went to the jury upon the first theory only, and the recovery is predicated upon that ground alone.

At the outset the appellant contends that, as the accident occurred on the navigable waters of the United States, the respondent's rights should have been determined by the admiralty rules of law, whether he sought his remedy in a court of admiralty or in a common-law forum. The rule to be followed is that laid down in *Kennedy* v. *Cunard Steamship*

*Co., Ltd.* (197 App. Div. 459). There also the plaintiff was a longshoreman, working for defendant in loading the cargo on board a steamship lying in the North river. He was working in the lower hold, and after quitting work was injured by falling through an open hatch as he tried to make his way to the bulkhead door in the dark, the hatch covers having been suddenly closed, shutting out all light from the deck where plaintiff was then standing. Mr. Justice PAGE, writing for a unanimous court, said (at p. 466): " These cases settle the law to be that actions *in rem*, whether arising under the general maritime law or to enforce liens given by the United States or local State statutes, must be prosecuted in admiralty in the United States courts, while actions *in personam*, arising out of maritime contracts or torts, may be brought in admiralty or on the law side of the United States court or in a State court having an appropriate common-law remedy. It is the right sanctioned by the maritime law that may be enforced by any court having jurisdiction of the parties or the *res* by the common-law remedies appropriate thereto. This clause gives a right of election of a forum for the enforcement of the maritime right or to remedy the maritime wrong, and thereby allows election of the procedure, whereby the matter may be decided. But the complaining party has no right of election to determine whether the defendant's liability shall be measured by common-law standards rather than by those of the maritime law. (*Chelentis* v. *Luckenbach S. S. Co.*, 247 U. S. 372, 383.) The maritime law, as fixed and determined by the acts of Congress and the general maritime law as accepted by the Federal courts, constitute part of the national law applicable to matters within the admiralty and maritime jurisdiction. The rights and liabilities arising out of maritime contracts or maritime torts, as recognized and declared by the maritime law, ·cannot be changed by State statute, nor by substitution of a common-law right or liability.

" The instant case is an action for damage for personal injuries for which there exists in this State a common-law remedy. Therefore, the action may be brought in our Supreme Court, the rules of practice, pleading and evidence of our courts apply, and the cause will be tried in conformity therewith; but the rules relating to contributory negligence, acts

of fellow-servants, and the measure of recovery must be determined by the maritime law and not by the common law."

The appellant insists that there is no admiralty rule of law requiring the master to furnish a reasonably safe place to work, the rule being a common-law rule and not one of admiralty; and that the duty placed upon the master in admiralty is only to furnish a seaworthy ship (which is considered the place furnished to the seaman in which to work) and reasonably safe appliances. This contention, so far as concerns longshoremen, is fully answered by the decision in *Imbrovek* v. *Hamburg American Steam Packet Co.* (190 Fed. Rep. 229). The facts there were very much like those in the present case. Plaintiff was injured in the lower hold of the steamship *Pretoria* while working for the stevedore, the Atlantic Transport Company. He was one of the gang loading and storing copper. He was at work under a hatch, whereof the covers had been taken off the middle section, leaving the two end sections still covered. The covering of the middle section had been piled on the other two. The hatches were divided as here by movable iron cross beams, placed athwart the ship, and the hatch covers rested on timbers placed crosswise to those beams and running to the hatch coaming. In the process of loading the copper it was piled on a flat, rope mat, with a bridle on each of two sides, made fast to a corner of the mat. Each bridle passed through a U-shaped iron shackle and the two shackles were placed over a hook at the end of the fall attached to the boom. The mat and its contents were lifted by a winch, swung over the hatch and lowered into the hold, where the mat was unhooked, the copper taken out, the shackle again placed in the hook and upon a signal being given to the winchman the mat was hauled up. On the occasion in question the mat caught under the cross beam which was instantly jerked out of its supports and fell into the hold with everything resting on it, including the hatch covers, striking the plaintiff who sustained severe injuries. The District Court awarded him a decree against the Atlantic Transport Company, his employer. In his opinion, Judge ROSE said (at p. 231): " There would have been no accident had the entire hatch been uncovered. To uncover a hatch takes time and labor. If bad weather comes,

it must be covered.   Unnecessary covering is to be avoided.
It is easy to make a partially covered hatch absolutely
safe.   The cross beams of the hatch have holes in the ends.
There are corresponding holes in the hatch combings.   Pins
can be put through those holes.   It takes about five minutes to
put them in.   When in place, an accident such as gave rise
to this case cannot happen.   *   *   *   Accidents often happen
because an opened hatch has been left unguarded or because
the hatchcoverings fall into the hold."   And further (at p.
239):   " The stevedore says that if there was any negligence
it was the negligence of a fellow servant of the libellant and
for that it is not responsible.   It admits that the duty to
provide a safe place in which to do the work is one which
cannot be delegated, but it points out that the duty is one of
construction or provision and not of operation.   It says that
the pins were provided.   If they were not used, it was the
fault of the gang boss.   The. gang boss, it says, was a fellow
servant of the libellant.   It does not seem important to deter-
mine whether he was or was not.   In view of the complete
control of the work which he was allowed to exercise·if he
chose, of his power to employ and discharge the men under
him, of the lack of any attempt at supervision over him, it
seems probable that he was a vice-principal.   It is not neces-
sary so to decide.   *The stevedore was bound to use due diligence
to see that the libellant had a safe place in which to work.*   If it
had issued orders to its foremen or gang bosses that they were
not to allow the men to work under partly covered hatches
unless the pins were in, then, if those instructions were
disobeyed, the negligence would be the negligence of the
gang boss.   If the gang boss was the fellow servant of the
libellant, the latter might not be entitled to recover.   There
is no evidence that any such orders, whether general or special,
were ever issued.   The stevedore's sole witness, Barttholl,
appears to have had entire charge of the work of loading and
unloading.   He, at least, appears to have occupied the position
of vice-principal.   The testimony, at all events, does not show
what other human being acted for the corporate respondent.
He admits that he never concerned himself about the pins.
He did not look to see whether they were in or out.   He issued
no orders about them.   It is evident from his testimony that

the stevedore did not give a thought to them. *In failing so to do it neglected a duty which it owed to the libellant and his mates.*"

Upon the appeal to the Circuit Court of Appeals the decree was affirmed upon the opinion below (*Atlantic Transport Co.* v. *Imbrovek,* 193 Fed. Rep. 1019). When the case reached the United States Supreme Court, the question of the duty of the employer to furnish a safe place to work was squarely presented. In his opinion (*Atlantic Transport Co.* v. *Imbrovek,* 234 U. S. 52, at p. 57) Mr. Justice HUGHES quoted from the opinion of the District Court, and said (at p. 58): "For its failure to use due diligence in seeing that the libelant had a safe place in which to work the District Court held the Transport Company liable." In the opinion the principal question discussed was that of the jurisdiction of the District Court to entertain the cause. In conclusion the court said (p. 63): " The remaining question relates to the finding of negligence. It is urged that the neglect was that of a fellow servant and hence that the petitioner was not liable. Both courts below, however, concurred in the finding that the petitioner omitted to use proper diligence to provide a safe place to work. (*Baltimore & Ohio R. R. Co.* v. *Baugh,* 149 U. S. 368, 386.) As the question belongs to a class which, under the distribution of judicial power is determinable by the Circuit Court of Appeals in last resort, we shall not undertake to discuss it at length or to restate the evidence [citing cases]. It is sufficient to say that we are satisfied from an examination of the record that the ruling was justified." We believe, therefore, that under that case and the *Kennedy Case (supra)* the rule of liability laid down by the learned trial court in his charge to the jury was correct. The question whether the defendant had furnished plaintiff with a reasonably safe place to work was a fair disputed question of fact, properly submitted to the jury upon conflicting testimony, much of which was that of experts, and we find no reason to interfere with the verdict.

Appellant also insists that the respondent assumed the risks of such dangers as were open and obvious, and that the admiralty rule in this respect applies. Such a contention

is not presented by any exception in the case. But if it were, it is sufficient to say that there is no evidence which would warrant a finding that there existed any such open and obvious danger as that which led to the accident in question, in view of the fact that the covered hatch conveyed no warning that the strong backs or covers were not properly secured in place. Plaintiff was hired to work in the hold of the ship storing the cargo. Whatever danger attended the handling by him of the barrels of oil within the hold was a risk incident to his employment, which he assumed. He did not assume any risk occasioned by the master's failure to furnish him with a safe place to work. As was said in the *Kennedy Case* (*supra,* at p. 462): "Whether the plaintiff, placed in the situation that he was by the closing of the hatch, and failing to get any response to his outcries, was chargeable with contributory negligence in going forward in the manner he did was clearly a question of fact for the jury. The plaintiff did not assume the risk. 'It is now the settled law of this State that the risks which a servant assumes are either such as are incident to his employment, after the master has discharged his duty of reasonable care to prevent them, or such as are quite as open and obvious to the servant as the master.' [*Eastland* v. *Clarke,* 165 N. Y. 427.] The plaintiff was not employed to work in the ship in the darkness. The risk of falling into the open hatch in the daytime, when engaged in the work, he assumed. But the risk of falling into the hatch, when all light had been cut off by the master's negligent act, he did not assume."

Appellant further contends that under the admiralty rule the question of contributory negligence was one for the jury. No such question was raised upon the trial in such a way, either by motion, request to charge, or other action, as to present the case for review here. Nor as a matter of fact is there any evidence in the record which would form the basis for such an issue.

The judgment and order appealed from will be affirmed, with costs.

CLARKE, P. J., SMITH, PAGE and GREENBAUM, JJ., concur.

Judgment and order affirmed, with costs.