## CENTRAL VERMONT RY. CO. v. SOUTHERN NEW ENGLAND R. CORPORATION.

### No. 2540.

District Court, D. Massachusetts.
Dec. 14, 1932.

Walter A. Dane, of Boston, Mass., John W. Redmond, of Newport, Vt., and George W. Wickersham, of New York City, for plaintiff.

Warner, Stackpole, Bradlee & Cabot and Pierpont L. Stackpole, all of Boston, Mass., for receivers.

John S. Murdock, of Providence, R. I., and Ralph E. Tibbetts, of Boston, Mass. (specially for John Marsch, a creditor), for defendant.

Raymond H. Favreau, of Southbridge, Mass., for John T. Brown, Herbert A. Fogg, Leon J. Deloge, Edward L. Williams, Robert A. McLaughlin, and J. P. Cunningham.

W. R. Gravel, of Southbridge, Mass., for Town of Southbridge.

LOWELL, District Judge.

This case rises out of the receivership of the Southern New England Railroad Company. It comes to the court on objections by the Centmont Corporation to a clear and complete report by La Rue Brown, Esquire, who was appointed master to consider the proofs of debt offered by three creditors of the company. It is admitted that debts are due to the Standard Oil Company in the sum of $150 and to John Marsch in the sum of $622,785.51. The only proof objected to is that of the Centmont Corporation, which has succeeded by assignment to the rights of the Central Vermont.

The master reported against the proof offered by the Centmont Corporation. On page 8 of his report he says: "I find that the Southern New England was a wholly owned subsidiary which was intended to be and was an instrumentality for carrying out the purpose of the Central Vermont to acquire and control a connection between its line at Palmer and Providence. * * *"

The Southern New England Railroad Company is a Massachusetts corporation organized for the purpose of building and operating the Massachusetts part of a railroad from Palmer to Providence, which was to connect at Palmer with a subsidiary of the Central Vermont Railway Company. The roadbed, which was built by John Marsch, had been partly completed when its operation ceased and it went into the hands of receivers. At the time of the appointment of the receivers, the entire stock of the Southern New England Railroad was owned by the Central Vermont. All the money which the Southern New England ever had came from the Central Vermont, and all the as-

sets which remain are the result of money furnished by it. A majority of the directors of the Southern New England were at all times directors of the Central Vermont. The president, chairman of the board, treasurer, and chief accounting officer of the Southern New England occupied like positions in the Central Vermont. The officers of the Southern New England received their salaries from the Central Vermont. The books of account of the Southern New England were kept at the office of the Central Vermont by the same accountants as kept its own books. It appears from the master's report that the entire record of the proceedings of the stockholders, directors, and executive committee of the Southern New England shows that no action was ever taken as to the raising or expenditure of funds, salaries, or duties of officers, except as provided in the by-laws, or any other action than the annual routine of electing officers and directors except votes made necessary in connection with petitions for the location of the railroad and other matters involved in acquiring the right of way.

To allow the Centmont Corporation to prove is tantamount to allowing a debtor to prove in bankruptcy in competition with his own creditors, a result which shocks the conscience of a chancellor who is familiar with the law of bankruptcy. The Centmont Corporation insists that this result is inescapable under the laws relating to corporations because the Southern New England Railroad is a corporation distinct from the Central Vermont and was not formed for any fraudulent purpose. It is true that there was no fraud, but it is also true that, except in form, all the acts of the Southern New England Railroad were the acts of the Central Vermont, and that, in many instances, the form of acting through a separate corporation was not followed.

The laws of Massachusetts require that a railroad shall be operated by a domestic corporation. The Southern New England Railroad Corporation was organized by the Central Vermont to build and operate that part of the proposed connection which lay in Massachusetts; another corporation, the Southern New England Railway, took up the work within the limits of Rhode Island. The Southern New England Railroad was not merely the agent of the Central Vermont to build the road in Massachusetts, it was the Central Vermont itself, clothed with the required separate corporate garments. If the laws of Massachusetts had not required the formation of a Massachusetts corporation, the railroad would have been built in exactly the same way by the Central Vermont itself. The Southern New England is merely the Central Vermont under another name.

We need not decide between the conflicting theories as to what a corporation is. Indeed it would be dangerous to dogmatize concerning a subject over which so much ink has been spilled. See Gray, The Nature and Sources of the Law, p. 51; Freund, The Legal Nature of Corporations; Wormser, The Disregard of The Corporate Fiction and Allied Corporate Problems; Anderson, Limitations of Corporate Entity; Machen, Corporate Personality, 24 Harv. L. Rev. 255; Laski, The Personality of Associations, 29 Harv. L. Rev. 404.

Some courts seem to have been plagued by the ghost of a corporation soul; as, for instance, the Virginia court which was unable to decide that a corporation composed entirely of negroes was incapable of holding property in breach of restrictions forbidding its ownership by persons of African descent, or the English courts which, despite Lord Wenbury's dissent in the Court of Appeal, could not make up their minds that an English company composed entirely of German subjects was an enemy in time of war. People's Pleasure Park Co. v. Rohleder, 109 Va. 439, 61 S. E. 794, 63 S. E. 981; Continental Tyre & Rubber Co. v. Daimler Co., [1915] 1 K. B. 893; Daimler Co. v. Continental Tyre Co., [1916] 2 A. C. 307.

One of the earlier cases in the federal courts is similar to the case at bar. The Baltimore & Ohio Railroad built a telegraph line by means of a subsidiary corporation. When it afterwards sold the line, the court held that the railroad was liable for a debt of the subsidiary corporation. The principal difference between that case and the present one is that there the subsidiary corporation was voluntarily formed, while here the subsidiary corporation was formed at the command of the commonwealth of Massachusetts. Interstate Tel. Co. v. B. & O. Tel. Co. (C. C.) 51 F. 49; Id. (C. C. A.) 54 F. 50; see, also, Colonial Trust Co. v. Montello Brick Works (C. C. A.) 172 F. 310; Southern Pac. Terminal Co. v. Interstate Commerce Comm., 219 U. S. 498, 31 S. Ct. 279, 55 L. Ed. 310; United States v. Delaware, Lack. & West. R. R., 238 U. S. 516, 35 S. Ct. 873, 59 L. Ed. 1438; Chicago, M. & St. P. Ry. v. Minn. Civic Ass'n, 247 U. S. 490, 38 S. Ct. 553, 62 L. Ed. 1229; United States v. Reading Co., 253 U. S. 26, 40 S. Ct. 425, 64 L. Ed. 760;

In re Muncie Pulp Co. (C. C. A.) 139 F. 546; In re Watertown Paper Co. (C. C. A.) 169 F. 252, 256; Gay v. Hudson River Electric Power Co. (C. C. A.) 187 F. 12; Clere Clothing Co. v. Union Trust & Savings Bank (C. C. A.) 224 F. 363; The Willem Van Driel, Sr. (C. C. A.) 252 F. 35; Fourth Nat. Bk. v. Portsmouth Corp. (C. C. A.) 284 F. 718; Wabash Ry. Co. v. Am. Refrig. Co. (C. C. A.) 7 F.(2d) 335; Costan v. Manila Electric Co. (C. C. A.) 24 F.(2d) 383; Industrial Research Corp. v. Genl. Motors Corp. (D. C.) 29 F.(2d) 623; Central Republic Bk. & Trust Co. v. Caldwell (C. C. A.) 58 F.(2d) 721. Contra, Finn v. Geo. T. Mickle Lumber Co. (C. C. A.) 41 F.(2d) 676.

The Supreme Court of the United States has never been troubled by theories of corporate entity. It has decided, in somewhat high-handed fashion perhaps, that a corporation was a citizen of the state where it was organized, and in more recent times that an act of Congress could not be nullified by creating separate corporations. Louisville, C. & C. Railroad Company v. Letson, 2 How. 497, 11 L. Ed. 353; Covington Draw Bridge Co. v. Shepherd, 20 How. 227, 15 L. Ed. 896; Thomas v. Board of Trustees, 195 U. S. 207, 210, 25 S. Ct. 24, 49 L. Ed. 160; United States v. Reading Co., 253 U. S. 26, 40 S. Ct. 425, 64 L. Ed. 760, and cases cited; see, also, Baltimore & Potomac R. R. Co. v. Fifth Bap. Church, 108 U. S. 317, 2 S. Ct. 719, 27 L. Ed. 739; McCaskill Co. v. United States, 216 U. S. 504, 30 S. Ct. 386, 54 L. Ed. 590.

The Southern New England Railroad was an instrumentality of the Central Vermont just as much as the subsidiary corporations involved in the Reading Case, the principal difference being that it was formed for a legitimate purpose. The fact that its birth was legitimate and not illegitimate does not make it any the less an instrumentality or agent.

■ The Centmont Corporation insists, however, that the question in this case has already been passed on by the Supreme Judicial Court of Massachusetts, whose decision is binding on this court. That case decided on demurrer that John Marsch could not sue the Central Vermont or the Grand Trunk on his contract with the Southern New England. (See Marsch v. Southern New England R. Corp., 230 Mass. 483, 120 N. E. 120.) The pleadings did not allege the insolvency of the Southern New England nor set forth the further facts as to the relations between the two corporations which have been proved in the present case.

The decision in the Massachusetts case might perhaps have been different if the facts had been those which are now before the court. See Finnish Temperance Soc. v. Socialistic Pub. Co., 238 Mass. 345, 130 N. E. 845. If, however, we assume that the Massachusetts law is in favor of the Centmont Corporation, it is not binding on this court. It has been the rule of the federal court since the decision of Story, J., in Swift v. Tyson, 16 Pet. 1, 10 L. Ed. 865, that the decisions of state courts are not binding on federal courts in considering questions of general law. That case has been severely criticized by two eminent jurists, solemnly and impressively by Mr. Justice Field, dissenting in Baltimore & O. Railroad v. Baugh, 149 U. S. 368, 390, 13 S. Ct. 914, 37 L. Ed. 772, and vituperatively by John C. Gray, Esquire, in "The Nature and Sources of the Law," p. 238, but it has been followed and its doctrine extended. New York C. Railroad Co. v. Lockwood, 17 Wall. 357, 21 L. Ed. 627; Baltimore & O. Railroad v. Baugh, 149 U. S. 368, 13 S. Ct. 914, 37 L. Ed. 772; Kuhn v. Fairmont Coal Co., 215 U. S. 349, 30 S. Ct. 140, 54 L. Ed. 228; B. & W. Taxi Co. v. B. & Y. Taxi Co., 276 U. S. 518, 48 S. Ct. 404, 72 L. Ed. 681, 57 A. L. R. 426. Mr. Justice Holmes has also criticized the rule of law founded on Swift v. Tyson in two dissenting opinions, first, in Kuhn v. Fairmont Coal Company, 215 U. S. 349, 370, 30 S. Ct. 140, 54 L. Ed. 228, with which White and McKenna, JJ., concurred, and again in B. & W. Taxi Co. v. B. & Y. Taxi Co., 276 U. S. 518, 532, 48 S. Ct. 404, 72 L. Ed. 681, 57 A. L. R. 426, with which Brandeis and Stone, JJ., concurred; but he is content, or perhaps it would be more accurate to say resigned, to allow it to have sway over cases which do not in any way relate to local questions, such as those touching the use of land.

Whatever may be thought of the reasoning of Mr. Justice Story in Swift v. Tyson, the result arising from it is of great practical importance in standardizing the law of the federal courts, thus enabling them to do justice between citizens of different states.

■ I have disregarded the objections of the receivers, as in my opinion the proper attitude of receivers in a case like the present is that of impartial stakeholders rather than partisans. I have not specifically mentioned the many objections of the Centmont Corporation, which are all overruled by the above decision, except its contention that John

Marsch is estopped to object to the Centmont proof. On this objection I adopt the finding of the master, as follows: "No one was misled by Marsch's acceptance of the receivership or took any action relying upon it. His objection to the claim in controversy was made with reasonable promptness upon the filing of the receiver's report. I do not see that there was any earlier opportunity to assert it." (Report, p. 10.)

The claims of the Standard Oil Company for $150 and of John Marsch for $622,785.51 are allowed. The claim of the Centmont Corporation is disallowed. If there be a question of costs in this case, they are awarded to John Marsch and refused to the Centmont Corporation and to the receivers.